# Monongahela River Consolidated Coal & Coke Company v. Jutte.

*Contract—Monopoly—Agreement in restraint of trade—Interstate commerce —Divisible contract.*

An agreement by which in consideration of a very large sum of money the owner of coal lands, coal mines and coal boats sells the same and covenants not to engage directly or indirectly "in the business of mining, marketing or shipping of coal in the territory traversed by the Monongahela, Ohio and Mississippi rivers and their tributaries for a period of ten years from the date hereof," is a reasonable contract, and is not contrary to the public policy of Pennsylvania, although it appears that the purchaser had similar contracts with a large number, although not all, of the coal operators and shippers doing business in the Monongahela valley in Pennsylvania.

The above contract, in so far as it affects business carried on in the territory contiguous to the Ohio and Mississippi rivers outside of the limits of Pennsylvania, violates the act of Congress of July 2, 1890, known as the antitrust or Sherman act and entitled: "An act to protect trade and commerce against unlawful restraints and monopolies." The contract, however, is divisible and the seller may be enjoined from engaging in the business of mining coal and marketing or shipping coal on the Monongahela river within the state of Pennsylvania for the period of ten years.

Argued Oct. 26, 1904. Appeal, No. 6, Oct. T., 1904, by defendant, from decree of C. P. No. 2, Allegheny Co., Jan. T., 1902, No. 28, on bill in equity in case of Monongahela River Consolidated Coal and Coke Company v. William C. Jutte. Before MITCHELL, C. J., DEAN, FELL, MESTREZAT, POTTER and THOMPSON, JJ. Affirmed.

Bill in equity for an account.

SHAFER, J., filed the following opinion:

The bill is for an injunction to restrain the defendant from carrying on the business of mining and shipping coal in the territory traversed by the Monongahela, Ohio and Mississippi rivers and their tributaries, contrary to his agreement not to do so, made with the plaintiff company on his sale of his mining and shipping business and the good will thereof to the plaintiff company.

## FINDINGS OF FACT.

1. The Pittsburg coal vein is traversed by the Monongahela

river for some eighty or more miles above its junction with the Allegheny river at Pittsburg, the vein lying throughout this distance above the river level. The river is made navigable by dams and locks, and can be navigated during the whole year except when closed by ice, and has been used for many years as a means of transporting coal to the head of the Ohio river.

2. The Ohio river, not being improved with dams and locks, is navigable only during periods of high water. The coal vessels are, therefore, tied up at the head of the Ohio until high water, and they are then floated down that river to the Mississippi on the current, but controlled and guided by powerful stern wheel steamboats made fast at the rear of a number of coal-containing vessels lashed together, and not in front, as their very inappropriate name of " towboats " would imply. These tows, as they are called, are landed at various points on the lower river, and the coal sold, and sometimes the vessels containing it also.

3. The coal within reach of the river in the first pool, i. e., at the side of the pool formed by the first or lowest dam in the Monongahela river, has been practically worked out for a number of years, and the river mining operations have for some years been practically confined to the second, third, fourth and fifth pools, and are mostly in the third and fourth. It does not appear very definitely how far back from the river the coal is mined to be brought to it for transportation, but it seems to be not more than ten miles on each side, and usually much less. There are railroads on each side of the river, which also transport coal. The Pittsburg vein is worked for a considerable distance on each side of the river tract above mentioned, and the product shipped by rail.

4. In 1898, the promotion of the plaintiff company was begun by Mr. J. B. Finley, now its president, by taking options from a large number, if not all, of the persons who were then engaged in the business of either mining or shipping coal from the Monongahela river. These options were all alike, upon a printed form, and provided that the bill of sale, if made, should contain a stipulation that the vendor would not, directly or indirectly, " engage in mining, marketing or shipping coal on the Mississippi, Ohio and Monongahela rivers, or their tributaries,

for a period of ten years, except in conjunction with vendee or his assigns."

5. The defendant, William C. Jutte, was then engaged in the mining and shipping of coal and marketing of it by means of the river, at wholesale and retail, on the Monongahela, Ohio and Mississippi rivers, shipping it to and selling it at Pittsburg, East Liverpool, Cincinnati and New Orleans, as a member of the firms of C. Jutte & Company, the Coal Bluff Coal Company and other companies and firms. On April 8, 1899, the defendant, W. C. Jutte, with the other members of the firm of C. Jutte, made with J. B. Finley a contract or option, containing the above-mentioned agreement as to remaining out of the business. At and about the same time, like agreements were made with J. B. Finley by other firms of which W. C. Jutte was a member, which were signed by him. Afterwards, in September, 1899, these options were assigned by J. B. Finley to the plaintiff company, and thereafter certain supplementary agreements were made with that company, fixing the prices of some of the properties.

6. On September 27, 1899, the plaintiff company accepted the options held by it as above stated, and on September 30, 1899, the Flinn Coal Company, one of the companies of which Jutte was a member, made a bill of sale of all its property, with the good will of the company, in the business of mining and shipping coal, to the plaintiff company; and on October 2, 1899, the firm of C. Jutte & Company transferred its property and good will to the plaintiff company, for the price of something over $1,000,000, and as a part of the same transaction, in consideration thereof and of this sale the firm of C. Jutte & Company, and each of its members severally and jointly, stipulated with the plaintiff company, "not to engage directly or indirectly, individually or through partnership or partnerships, limited partnerships, corporations (except in conjunction with the said The Monongahela River Consolidated Coal & Coke Company), in the business of mining, marketing or shipping of coal in the territory traversed by the Monongahela, Ohio and Mississippi rivers and their tributaries for the period of ten years." At or about the same time, similar agreements were made with the plaintiff company by the other firms of which Jutte was a member, and signed by those firms and each

of their members, including W. C. Jutte, the only difference in the terms of said agreements being that they prohibited the mining, marketing or shipping of coal "in the territory traversed by the Monongahela, Ohio or Mississippi rivers and their tributaries," this being the printed form which was used by the parties, the words " in the territory traversed by " being struck out of the agreement signed by C. Jutte & Company.

7. The plaintiff company then was, and is, a corporation of the state of Pennsylvania, having its principal office in the city of Pittsburg, and is authorized to mine, market and ship coal.   About the same time, the plaintiff company purchased nearly all the mines then opened on the Monongahela river from which coal was shipped by river, and acquired all the coal-containing vessels and towboats then engaged in the business, except those of Jones & Laughlin, a manufacturing company not engaged in the coal business except for its own supply, and a few others owned in Cincinnati, which were not regularly engaged in the transportation of coal from Pittsburg.   It also acquired nearly all the coal landings about Pittsburg, taking from all the persons who sold mines or boat, or both, stipulations similar to that which they took from Jutte in regard to their future engagement in the coal business on the rivers. The plaintiff company since its formation has been engaged in the business of mining coal in the district on the Monongahela river, above described, and shipping the same by that river to Vicksburg, Cincinnati, Louisville, New Orleans, and other cities on the Ohio, Monongahela and Mississippi rivers, and also to a limited extent in the coal fields of Alabama, where shipments are made by rail.   At this time the plaintiff company ships eighty-five to ninety per cent of all the coal shipped by river out of the Monongahela valley, and of the remainder from one to two per cent is shipped by companies with which the defendant is connected.

8. W. C. Jutte and the firms with which he was connected received from the plaintiff company payment for the property transferred by them almost, if not altogether, in stock and bonds of the plaintiff company, which were afterwards sold by him to other persons, and he was instrumental in inducing other parties engaged in the coal business in the Monongahela valley to enter into similar agreements with the plaintiff company.

9. Some time thereafter, W. C. Jutte organized companies, one of them being a company called C. Jutte & Company, chartered under the laws of the state of New Jersey for the purpose of carrying on the business of mining and shipping coal on the Monongahela, Ohio and Mississippi rivers, in competition with the plaintiff, and has purchased large tracts of coal near the Monongahela river within the district above described, and has purchased coal boats, barges and towboats for the purpose of transporting coal to the lower river, substantially as alleged in the plaintiff's bill except as to the Castle Shannon mines, notwithstanding the denials of the answer which there was no attempt to sustain by the defendant's evidence, and the defendant Jutte is now actively engaged as a member and promoter of one or more companies in mining, shipping and marketing coal on the Monongahela, Ohio and Mississippi rivers.

10. Within the territory traversed by the Monongahela, Ohio and Mississippi rivers and their tributaries, or, in other words, in the Mississippi valley, there are extensive coal fields now worked on the Allegheny, Kanawha, Cumberland, Tennessee, the upper Mississippi, the Wabash and the Missouri rivers, in which neither the plaintiff nor the defendant ever did any business in the way of mining or shipping coal. On the Monongahela river the territory in which coal is mined and shipped upon the river is as above described. It does not appear that any coal is or can be shipped upon the tributaries of that river. No coal appears to be mined in any territory which may be said to be for coal-shipping purposes on the Ohio river, but coal is largely mined on its tributaries above mentioned.

### CONCLUSIONS OF LAW.

It plainly appears from the above findings of fact, that the defendant has violated, and is violating, his agreement with the plaintiff company, and that if the plaintiff has standing in court, and the agreement of the defendant is valid and binding, the plaintiff is entitled to the relief sought for by the bill. The defendant, however, contends that the plaintiff company has no valid charter and has no right to sue; that it is organized in contravention of the act of congress of July 2, 1890, com-

monly called the "Sherman act," and further that the contract of defendant not to enter into the coal business, as above set out, is illegal and void.

That partial and reasonable restraint of trade may be lawfully created by contract between parties, and may be enforced by injunction, has been frequently decided in Pennsylvania. In the case of Smith's Appeal, 113 Pa. 579, Mr. Justice TRUNKEY said : " The principle is this : public policy requires that every man shall not be at liberty to deprive himself or the state of his labor, skill or talent, by any contract that he enters into. On the other hand, public policy requires that when a man has by skill, or by any other means, obtained something that he wants to sell, he should be at liberty to sell it in the most advantageous way, and in order to enable him to sell it is necessary that he should be able to preclude himself from entering into competition with the purchaser. In such case the same public policy enables him to enter into any stipulation, however restrictive it is, provided the restriction in the judgment of the court is not unreasonable, having regard to the subject-matter of the contract."

As we understand the cases, it has uniformly been held that a contract restraining the defendant from carrying on his business through an extent of territory greater than that in which he had before carried it on, or which was within the fair reach of his business, is unreasonable and, therefore, void. A contract, therefore, which would exclude the defendant from the mining and shipping of coal either in the territory traversed by, or on, the Mississippi river and its tributaries, considering the number of places at which coal may be there mined, is undoubtedly an unreasonable restraint upon one whose business sold to the plaintiff was that of mining coal on the Monongahela river and shipping it down the Ohio and Mississippi for sale. We are of opinion, therefore, that the plaintiff is not entitled to an injunction restraining the defendant from mining and operating throughout the whole extent of territory embraced by the Mississippi river and its tributaries.

[It is contended, however, by the defendant that the stipulation is divisible, and that even if it is void, as applied to the largest extent of territory described, it is not invalid as to parts of it. There is no question that such contracts are divisible,

and that one part or stipulation thereof may be void while the other is not: Oregon Steam Navigation Co. v. Winsor, 87 U. S. 64. It seems to us that the contract in question may be fairly said to speak of six different districts, viz: each of the rivers, Monongahela, Ohio and Mississippi, and the district included by each of them and its tributaries; and if any of the districts so designated shall appear to be not more than is reasonable for the protection of the purchaser of the defendant's good will, the contract as to it would be valid.] [4]

We have already said that the territory included by the Mississippi and its tributaries is too large. For the same reason it appears to us that the territory included by the Ohio river and its tributaries is too large. No coal was ever mined by the defendant on either the Ohio or the Mississippi rivers, and the marketing or shipping of coal which was done by him on those rivers was merely incidental to the mining done by him on the Monongahela, his sales being confined to four or five places along the whole extent of both rivers. It would seem, therefore, that a contract restraining the defendant from marketing or shipping coal at any and every point on these rivers is unreasonable and void.

[It remains to consider whether or not the contract not to mine, market or ship coal on the Monongahela river is reasonable. The expression, " mining coal on the Monongahela," we take to mean mining the coal adjacent to that river, which might be conveyed to and shipped upon the river within the limits above mentioned. The defendant was engaged, at the time of selling out the business and good will of the companies with which he was connected, in mining generally in the Monongahela river district, which, as above stated, is a small and fairly well-defined district. We see nothing unreasonable in an agreement connected with the sale of the good will of the mining business in that district to remain out of the business of mining and shipping coal in such a district, although there were parts of the district in which the defendant did not actually operate mines or ship coal.] [5]

As to the allegation that the plaintiff company has no valid charter and is, therefore, not entitled to bring suit, we are of opinion that the charter cannot be declared void collaterally in a suit brought by the company upon contracts made with it,

and especially in a suit against one who has dealt with the company as a corporation.

It is further claimed by the defendant that the contract sought to be enforced by this proceeding is void under the act of congress of July 2, 1890, which declares to be illegal every contract in restraint of trade or commerce between states. So far as the business of mining is concerned, it is very plain that an agreement or combination in regard to it is not within the purview of the act of congress, mining not being in any sense commerce, at least not interstate commerce : United States v. Knight Co., 156 U. S. 1 (15 Sup. Ct. Repr. 249).   It remains to consider the effect of that part of the contract which probits the marketing or shipping of coal on the Monongahela river.   The Monongahela river lies partly in the state of West Virginia and partly in Pennsylvania.   The contract not to market or ship coal on the Monongahela river, so far as it prohibits the shipping of coal mined in West Virginia into Pennsylvania, or vice versa, would, therefore, seem to be a restraint of interstate commerce.   It is true that, in fact, the plaintiff company does not market or ship coal except that which it mines, but the language of the contract is sufficient to cover all marketing and shipping of coal whatsoever.   We are, therefore, of opinion that the contract, so far as it prohibits the marketing and shipping of coal between or within the states on the Monongahela river, is made void by the act of congress.   This, however, does not affect the validity of the contract so far as marketing and shipping coal within the state of Pennsylvania is concerned : Addyston Pipe and Steel Co. v. United States, 175 U. S. 211 (20 Sup. Ct. Repr. 96).

We are, therefore, of opinion that the plaintiff is entitled to an injunction restraining the defendant from engaging directly or indirectly, individually or through partnership or partnerships, limited partnerships or corporations (except in conjunction with the plaintiff company), in the business of mining, marketing or shipping of coal on the Monongahela river within the state of Pennsylvania, for a period of ten years from October 2, 1899, and that the defendant pay the costs.

*Errors assigned*, among others, were (4, 5, 6) portions of opinion as above, quoting them and the decree.

*Wm. B. Rodgers*, with him *Henry A. Davis* and *J. Rodgers McCreery*, for appellants.—The decree is founded upon a number of agreements between complainant and defendant, and corporations and partnerships in which he was interested, containing trade restrictions. We contend that the agreements referred to, with others of a similar character taken at the same time, constituted, or tended to constitute, a monopoly in complainant : Morris Run Coal Co. v. Barclay Coal Co., 68 Pa. 173 ; Nester v. Brewing Co., 161 Pa. 473.

Unless a covenant in restraint of trade is merely auxiliary to a lawful contract, it is void : United States v. Addyston Pipe & Steel Co., 85 Fed. Repr. 271.

We contend that the contract was inseparable; that the restriction being too broad or extensive was illegal, and that the restriction falls.

While a trade restriction may be reformed by striking out such part of it as is unreasonable, the general rule applies that the reason for the severance must appear in the agreement itself so that a new contract be not made for the parties : Mills v. Dunham, L. R. 1 Ch. (1891), 576.

The agreement affected interstate commerce and is in violation of the Sherman act: Gibbs v. McNeeley, 118 Fed. Repr. 120 ; United States v. E. C. Knight Co., 156 U. S. 1 (15 Sup. Ct. Repr. 249).

*George C. Wilson*, with him *Chas. G. McIlvain*, for appellee.—Plaintiff company is not a monopoly : Oregon Steam Nav. Co. v. Winsor, 87 U. S. 64.

The contract is divisible : Smith's App., 113 Pa. 579 ; Leather Cloth Co. v. Lorsont, Law Rep. 9 Eq. 345 ; Chitty on Contracts, 987 ; Oregon Steam Nav. Co. v. Winsor, 87 U. S. 64 ; Rousillon v. Rousillon, L. R. 14 Chan. Div. 351 ; Carter v. Alling, 43 Fed. Repr. 208.

The existence of the plaintiff company is not a violation of the Sherman act: Addyston Pipe & Steel Co. v. United States, 175 U. S. 211 (20 Sup. Ct. Repr. 96) ; United States v. Knight Co., 156 U. S. 1 (15 Sup. Ct. Repr. 249) ; United States v. Joint-Traffic Assn., 171 U. S. 505 (19 Sup. Ct. Repr. 25) ; United States v. Trans-Missouri Freight Assn., 166 U. S. 290 (17 Sup. Ct. Repr. 540.)

OPINION BY MR. JUSTICE DEAN, December 31, 1904:

In the year 1899 Finley and Whitney commenced taking options in writing from owners and operators of coal properties on or adjacent to the Monongahela river. The river was navigable for coal shipping about eighty miles southwest from its junction with the Allegheny river at Pittsburg, and for the greater part of this distance is in Pennsylvania. At the time the options were being taken a large number of persons, partnerships and companies were engaged in the business of mining and shipping coal down the river from the Monongahela territory to points on the Monongahela, Ohio and Mississippi rivers as far south as New Orleans, reaching points in all the states through which the rivers flowed. The object of the promoters was to take options from all the coal operators on the Monongahela from whom they could buy at a price to be agreed upon. Out of the whole number of operators, they agreed with and took an optional purchase from many of them, among these last this defendant and his partners in the coal business. The purchase from defendant and his partners included all the property of the latter then operated by them on the Monongahela river, coal mines, coal boats, towboats, steamers, shipping and landing wharves from Pittsburg to New Orleans. Finley and Whitney also took like options from all the coal operators with whom they could agree, and who were engaged in a like business to Jutte and his partners. It was not a conspiracy or combination between all of the selling companies who, along with defendant, gave options on their properties to plaintiff to purchase and then contracted not to enter into competition with plaintiff on that river for a fixed period, for, so far as appears, each vendor contracted for himself alone, without reference to any other ; but as concerned results the consequences to interstate commerce were the same as if all the vendors had joined in one contract with plaintiff. To that extent traffic was stopped on their part the same as if a direct combination among them all had been made. A large number of mines, going operations on the Monongahela, they did not buy or obtain options for. There was also a large number of steamboats and other transportation property on which options were not taken.

On October 2, 1899, in pursuance of the optional agree-

ments with defendant and his partners, for the consideration
of over $1,000,000, which was paid, all the property was
transferred to plaintiff. The other operators who had given
options but had no connection with the defendant, about
the same time transferred their properties to plaintiff. The
plaintiff company was at the time of the transfer and still
is a Pennsylvania corporation. Within fifteen months after
this transfer by Jutte and after he had received the considera-
tion money, he joined with others and obtained from the state
of New Jersey a charter for a coal company, purchased and
opened large tracts of coal land upon the Monongahela, also
boats for transportation, and is now actively engaged in the
business of mining and transporting coal upon the Monon-
gahela, Ohio and Mississippi.

There is no dispute as to the main facts ; so far as a man can
bind himself by a written stipulation not to do a particular
thing, the defendant, after receiving the full consideration for
his promise, is openly and defiantly violating it. He justifies
this violation on two grounds : (1) The contract with the
others entered into between him and plaintiff constituted
a monopoly and is therefore void because against public
policy. (2) The contract is in violation of the act of con-
gress of July 2, 1890, commonly known as the anti-trust or
Sherman act, and is therefore void.

Each of the transfers directly to the plaintiff company em-
bodies this stipulation :

"We severally and jointly stipulate, covenant and agree to
and with the said the Monongahela River Consolidated Coal
and Coke Company, not to engage directly or indirectly, indi-
vidually or through partnership or partnerships, limited part-
nerships, corporations (except in conjunction with the said
the Monongahela River Consolidated Coal and Coke Com-
pany) in the business of mining, marketing or shipping of
coal in the territory traversed by the Monongahela, Ohio and
Mississippi rivers and their tributaries for the period of ten
(10) years from the date hereof."

It may be argued, as is argued here, that it was the intention
of these contracting parties to create a monopoly in the plain-
tiff of the coal mining business adjacent to the Monongahela
river, but that is an inference from the circumstances dehors

the agreement.  So far as appears from the face of the agree-
ment, except as to the restriction of defendant to time and
place, it was simply a purchase at full price by one coal pro-
ducer of another's plant.  To monopolize, according to the
Century Dictionary, is " to obtain or engross the whole of; ob-
tain exclusive possession of. "  Assume that the plaintiff
bought in addition to defendant's plant, forty-nine others and
that it had a capital of $40,000,000 in stock and bonds ; then
at the rate it paid for this property it could not have been far
from the end of its resources.  The evidence shows without
contradiction, that there were eighteen mines in operation
which the plaintiff did not buy, besides there were many
thousands of acres of workable coal land accessible to the river
which could have been bought had it desired to obtain or en-
gross the whole.  The defendant himself within a few months
bought other coal lands and opened mines on the Monon-
gahela ; he has also purchased and built boats and acquired
all the means of transportation to successfully compete with
plaintiff company.  Whatever may have been the undis-
closed intention of plaintiff at the date of its purchase, neither
the agreement it made with defendant nor those it made with
his covendors, nor any of the surrounding facts at the date of
the agreement, unless it be the restriction before quoted, show
any intention to obtain exclusive possession of either all coal
or means of transportation in the Monongahela valley.

That stipulation does undoubtedly exclude the defendant
and all others signing similar agreements from mining coal on
the Monongahela, or shipping on that river, the Ohio and
Mississippi or their tributaries and to that extent the stipula-
tion constitutes a monopoly, that is, a monopoly in so far as
it debars those particular individuals for a specified term of
years from engaging in that particular business on certain
rivers.  Is that stipulation void because contrary to public
policy?  As we understand the public policy of this common-
wealth, both as disclosed in the constitution of 1874 and as
apparent in all the legislation since, it is to encourage and
promote large aggregations of corporate capital for the develop-
ment of all the commonwealth's resources.

The last case in this state distinctly following the older rul-
ings, is Morris Run Coal Co. v. Barclay Coal Co., 68 Pa. 173.

That case held to the principle that all restraints on trade are injurious to the public, and, therefore, presumably illegal and void on the ground of public policy. In that case five coal companies had entered into an agreement to mine coal and then practically pool the product, each through a committee to equalize their respective shares in the fund according to the award of the committee, which committee was to determine and control the output of the mines so as not to lower the market price of coal. A draft drawn by one of the coal companies on the other to equalize the division between them, after acceptance, was protested for nonpayment. Suit was brought and the defense was made, that being based on the pooling agreement, that agreement was in restraint of trade and was void because against public policy. This court so decided and the plaintiff was not permitted to recover. That case was decided in 1871. While we have no doubt as to the soundness of the general principle laid down in that case, we doubt if today the court would hold on the particular facts developed, that the principle was applicable to those facts.

We think that perhaps at this day we would go further, and inquire whether in view of the purpose of the contract and the slight restraint it imposed on trade, it was unreasonable and therefore void, and not void solely because it to a certain extent monopolized the production of coal. For in a certain sense every coal corporation with a large capital engrosses the business to the exclusion of individuals of small means ; it is able to buy and develop a large acreage and open upon it many coal mines ; then to supply itself at a heavy outlay with all the means of transportation to market. It buys up the stock of smaller corporations and the property of individuals and consolidates them in some form into one company under one management. Probably, at this day, if the five companies in the case cited desired to stop competition among themselves and cheapen production by cheapening the cost of management, they would, under our corporation act of 1874, and its supplements, adopt some scheme of consolidation under one charter and thus to a greater extent and far more effectually suppress competition than they did under their pooling agreement which was declared illegal because against public policy. The professed purpose in organizing these large corporations is not to

kill competition, but to cheapen production in the interest of the public. Yet whatever the real purpose competition is stopped by an entirely lawful method. Prior to the adoption of our present constitution, to obtain authority to organize a coal corporation it was necessary in each instance to resort to the legislature for a special act. Compared with the number now in existence of such corporations but few were organized. But the present constitution prohibited all such special acts and declared in effect, that in the future all such corporations should be organized under the general laws to be adopted by the legislature. The legislature enacted the general corporation act of 1874, a most liberal act in its requirements. Very soon a host of coal corporations sprang into existence which with their large capital bought out, or by their cheaper production drove out, individual producers, so that to-day there is but little competition in the business with individuals. We have only to peruse our own constitution and the statutes adopted in pursuance of its mandate, to learn what has been the public policy in this regard in the commonwealth. If competition has been largely suppressed, if the courts more liberally interpret in their application the common-law rules on the subject of monopoly, it is only because a more rigorous interpretation would defeat the true intent and meaning of our constitutional and statutory legislation on the subject. Our decisions on this subject may not be in accord with those in some other states and possibly not in accord with those in the federal courts, but in so far as they affect matters only within the territorial jurisdiction of this commonwealth and do not conflict with the constitution of the United States or statutes adopted in pursuance thereof, we believe they are sound because in accord with the public policy of this state, and we shall adhere to them.

The opinion in the case cited is a very able one by the late Chief Justice AGNEW in which most of the English authorities and those of our own states up to that day, 1871, are noticed. But since then both in England and this country the doctrine has been much relaxed as to all such contracts. A full review of the cases is found in Carter v. Alling, 43 Fed. Repr. 208, decided in 1890. In that case BLODGETT, J., says:

" The only defense seriously insisted upon in the case is that

this contract is void as a contract in restraint of trade. . . . In the earlier English doctrine upon the subject of contracts, it was held that they were contrary to public policy, and void; but as the later cases came before the court, this doctrine was much relaxed, and the first modification of the doctrine was the recognition of the validity of contracts of this nature where the restraint was limited as to space or time and reasonable in its nature. And the reported cases are abundant in which an undertaking by one person not to carry on a given business within a limited area and within a fixed period of time has been sustained. . . . In later years a further relaxation of the old rule has grown up in England and America and the courts have repeatedly recognized the validity of contracts in the restraint of trade throughout the entire country, where such restraint was not unreasonable in view of the nature and extent of the business of the covenantee."

This is the general current of decision in this day. When a contract is presented which in some degree restrains trade, we do not at once decide that it is void as against public policy, but we go further and inquire, is it limited as to space or time, and is it reasonable in its nature? We are approaching nearer and nearer to the conclusion, although we have not yet reached it, that common honesty is the true public policy.

This contract is limited as to time, ten years; it is limited as to space, the immediate territory adjacent to three navigable rivers and their tributaries. This is its plain interpretation, although these words are not used; the boats purchased could reach no further than the landings and wharves thereon. Then is the restriction reasonable? The time was not an indefinite period as in some of the cases; shipments could be made owing to the uncertainty of navigation but once or twice a year. The time and space covered by the restriction were each, considering the character and extent of the business, reasonable. The defendant also sold his good will in the business. Considering the facts and that a full price was paid, even though the agreement restrained defendant, we think the restraint reasonable and therefore the contract was not a violation of the public policy of this state, and hence as concerns that point it ought to be enforced in equity.

The next question is, is it prohibited by the act of congress

of July 2, 1890, known as the anti-trust or Sherman act? That act is entitled : " An act to protect trade and commerce against unlawful restraints and monopolies." The first section of the act declares that : " Every contract, combination in the form of trusts or otherwise or conspiracy in restraint of trade or commerce among the several states or with foreign nations is declared illegal."

The leading facts in the Northern Securities case, as stated by Justice HARLAN who rendered the majority opinion of the court, are very briefly these : The Great Northern and Northern Pacific Railway Companies, having in view the ultimate placing of their systems under a common control, purchased the capital stock of the Chicago, Burlington & Quincy Railway Company and exchanged therefor the joint bonds of the two purchasing roads, thus became the owners of $107,000,000 of the $112,000,000 of the whole capital stock of the purchased road, whose lines aggregated about 8,000 miles, main line and branches, and which after running through several states connected at the western end with the Northern Pacific, one of the purchasing roads. By this operation the purchasing roads obtained full control of the purchased road with its main line and branches. Then Hill and Morgan, holders of stock respectively in the two purchasing companies, with associate stockholders in each company respectively, entered into a combination to form under the laws of New Jersey a holding corporation to be called the Northern Securities Company with a capital stock of $400,000,000 ; to this company in exchange for its capital stock was to be turned over the capital stock, or a controlling interest in it, of each of the railways forming the combination, with power in the holding company to vote such stock and in all respects to act as the owner thereof. This, practically, would enable the holding company to pursue a policy which would benefit all the constituent companies at the expense of the public, take away all inducement to competition between them and be a virtual monopoly of interstate and foreign commerce, theretofore carried on by competitors. The organization was completed according to the terms proposed in the original combination. It was declared illegal by the supreme court of the United States. Justice HARLAN speaking for the court

says: "In our judgment the evidence fully sustains the material allegations of the bill and shows a violation of the act of Congress, in so far as it declares illegal every combination or conspiracy in restraint of commerce among the several states and with foreign nations, and forbids attempts to monopolize such commerce or any part of it."

The facts and the inferences from them in that case, popularly known as the Northern Securities Company case, are distinctly different from those in the case before us. As Justice HARLAN says in the course of the opinion: "Necessarily also the constituent companies ceased under such a combination to be in active competition for trade and commerce along their respective lines, and have become practically one powerful consolidated corporation by the name of a holding corporation, the principal, if not the sole object for the formation of which, was to carry out the purpose of the original combination, under which competition between the constituent companies would cease." The New Jersey charter of the holding company does not disclose, at least only very vaguely, the real purpose of the combination, but the case of the United States was supplemented by depositions, which left no doubt of its purpose; that purpose was, by agreement, to stifle all competition in freight and passenger business between what had theretofore been competing railroads engaged in interstate commerce, a commerce which had been conducted by rail, which could be conducted nowhere else than on the narrow way owned and under the complete control of the holding company. This in the very words of the first section of the anti-trust act, was a "combination or conspiracy in restraint of trade" between the states. It placed the entire control of the charges for interstate commerce on these railroads in the holding company, a New Jersey corporation, which could exercise its despotic control solely in the interest of its stockholders regardless of the interests of the people. But those are not the facts with reference to this plaintiff corporation. It carried nothing across the continent on a railroad of which it was in absolute control; its traffic was on a natural highway of which it had no control whatever, either as to rates or facilities for shipment. The contract between defendant and the other persons from whom plaintiff purchased was between them alone. Except in so far as the contract bound

defendant to withdraw from a limited market for a limited period the public was in no way affected by that contract; everybody was as free to navigate the three rivers and their tributaries as before; no one could place a contract obstruction in them for they are navigable waters of the United States as uncontrollable by artificial means as the tides of the sea.

But notwithstanding this freedom of the highway, does the contract constitute a combination or conspiracy under the anti-trust act in restraint of trade or commerce? The United States enforces no public policy as a state policy, except so far as established by the United States constitution and the laws made in pursuance thereof. The opinion of Justice HARLAN, already noticed, after citing the authoritative interpretations of the anti-trust act by that court asks this question: " Do former adjudications determine the controlling questions raised by the pleadings and proofs? " (in the case before him). To this he answers: " Although the act of congress known as the anti-trust act has no reference to the mere manufacture and production of articles or commodities within the limits of the several states, it does embrace and declare to be illegal every contract, combination or conspiracy, in whatever form, of whatever nature and whoever may be parties to it, which directly or necessarily operates in restraint of trade or commerce among the several states or foreign nations; that the act is not limited to restraints of interstate and international trade or commerce that are unreasonable in their nature but embraces all direct restraints imposed by any combination, conspiracy or monopoly upon such trade or commerce."

Although Justice BREWER, while concurring in the judgment did not concur in all the reasons therefor, and particularly the last clause of the preceding sentence of Justice HARLAN, in which it is declared that the act of congress includes all direct restraints upon commerce without considering their reasonableness. As to that question he says: " Instead of holding that the anti-trust act included all contracts reasonable or unreasonable in restraint of interstate trade, the ruling should have been, that the contracts there presented (the Northern Securities case) were unreasonable restraints of interstate trade and as such within the scope of the act." While, if the decision had been based on the unreasonableness of the Northern Securities

contract, this would have been a decision by a minority of the court, yet Justice BREWER, while not concurring in that reason, does concur in the announcement of Justice HARLAN, that the contract in that case operated as a direct restraint upon interstate commerce. It is, therefore, the law, not only the statute itself but its interpretation by the highest federal court. In fact, that interpretation is not new, it only follows many older ones, not all on the same statute of course, for it was only passed in 1890, but on the power of congress to legislate on subjects, where that power has been expressly conferred upon it by the constitution of the United States.

We are of opinion that this contract is in direct restraint of interstate commerce, not only under the Northern Securites decision already cited, but under other decisions of the same court cited in the opinion in that case, not that we think, in view of the purpose of this contract and the limited territory and time covered by it, the restriction is unreasonable, but because the United States statute as interpreted by the United States court so declares. If it were a Pennsylvania statute, reaching only Pennsylvania territory, then under common-law rules of interpretation we would decide differently, but the restriction in this contract reaches into and restricts traffic in many states. It is no answer to say that the restriction as to time is short and as to territory comparatively very limited. That the necessity of some protection to the purchaser is so manifest in view of the large price paid defendant, that at least, as to him, it is not unreasonable. These considerations have little or no weight with us when we are called upon to interpret a contract the stipulations of which clash with an act of congress regulating interstate commerce. In such case we must follow the United States courts. This, however, does not take away our jurisdiction over contracts made in Pennsylvania so far as they affect only Pennsylvania territory. Justice JACKSON, then a circuit judge, afterwards justice of the supreme court of the United States, In re Greene, 52 Fed. Repr. 104, uses this language: "But congress has not the power or authority under the commerce clause, or any other provision of the constitution to limit and restrict the right of corporations created by the states or the citizens of the states in the acquisition, control and disposition of property." The learned judge of the court below

recognizing this as the law, and that this contract by its terms reached beyond the boundaries of this state, nevertheless held that the contract was divisible and that part of it which stipulated that defendant would not mine, market or ship coal on the Monongahela, being divisible from that part which restricted him from carrying on interstate traffic, the contract so far as confined to this state should be enforced. This is the latter part of the third conclusion of law:

"It remains to consider whether or not the contract not to mine, market or ship coal on the Monongahela river is reasonable. The expression, 'mining coal on the Monongahela,' we take to mean mining the coal adjacent to that river, which might be conveyed to and shipped upon the river within the limits above mentioned. The defendant was engaged at the time of selling out the business and good will of the companies with which he was connected, in mining generally in the Monongahela river district, which, as above stated, is a small and fairly well-defined district. We see nothing unreasonable in an agreement connected with the sale of the good will of the mining business in that district to remain out of the business of mining and shipping coal in such a district, although there were parts of the district in which the defendant did not actually operate mines or ship coal."

This conclusion only bears directly on the reasonableness of the restriction, at the same time the limited territory in which it may be enforced is designated; but in the second conclusion of law the court says:

"It is contended, however, by the defendant, that the stipulation is divisible, and that even if it is void as applied to the largest extent of territory described, it is not invalid as to parts of it. There is no question that such contracts are divisible, and that one part or stipulation thereof may be void while the other is not: Oregon Steam Navigation Co. v. Winsor, 87 U. S. 74. It seems to us that the contract in question may be fairly said to speak of six different districts, viz: each of the rivers, Monongahela, Ohio and Mississippi, and the district included by each of them and its tributaries; and if any of the districts so designated shall appear to be not more than is reasonable for the protection of the purchaser of the defendant's good will, the contract as to it would be valid."

We consider these two conclusions together for they are somewhat interdependent.    Both are earnestly attacked as error by appellant's counsel.    It is argued : " That while a trade restriction may be reformed by striking out of it such part as is unreasonable, the general rule applies, that the reason for the severance must appear in the agreement itself, so that a new contract be not made for the parties."    It is argued, that the court itself must on a mere inspection of the agreement be able to separate the good from the bad.    This, as the court below demonstrates, is not an exact statement of the rule nor the correct rule as held in Smith's Appeal, 113 Pa. 579, and 1 Parsons on Contracts, 457 : " Where one gives a good consideration and thereupon another promises to do two things, one legal and the other illegal he shall be held to do that which is legal unless the two cannot be separated."    The defendant, in consideration of the purchase money, covenanted not to engage directly or indirectly in the business of mining, marketing or shipping coal in the territory traversed by the Monongahela, Ohio and Mississippi rivers and their tributaries for the period of ten years.    The anti-trust act does not apply to manufacturing, mining or other productive industries: United States v. Knight Co., 156 U. S. 1; * United States v. Freight Association, 166 U. S. 290 ; † United States v. Joint-Traffic Association, 171 U. S. 505. ‡    Hence, of itself the mining and shipping of coal as a mere productive industry, no matter how large may be the capital of the producing corporation, how many smaller operators or corporations it may have absorbed, as long as it does not directly repress competition, is not obnoxious to the anti-trust act.    This contract so far as it restrained defendant from mining and shipping coal in Pennsylvania is good ; so far as it tended to restrain him from carrying on interstate commerce it is bad and cannot be enforced.  We have found no authority, nor has appellant pointed us to one, which holds that if a contract be illegal and not on its face severable the whole contract is void.    We think the true rule to be, that if any part of an illegal consideration be not divisible the contract falls.    Here the consideration for de-

---

* Also reported 15 Sup. Ct. Repr. 249.
  † "          "       17  "     "     "     540.
  ‡ "          "       19  "     "     "          25.   Reporter.

fendant's promise was $1,000,000 ; his covenant was not to mine and ship on these rivers ; the law steps in and severs the contract by declaring it is unlawful as concerns two of those rivers but lawful as to the third ; why is not this a severance of the good part from the bad as much so as if he had specified that for a distinct part of the consideration he covenanted not to mine and ship on the Monongahela in Pennsylvania, and for another and distinct part of the consideration he covenanted not to mine and ship on the Ohio and Mississippi ?  And this divisibility of the contract was as clear the day it was executed as to-day, for that part agreeing not to ship on the Ohio and Mississippi was unlawful then and that part agreeing not to mine and ship on the Monongahela was good then.  The defendant knew or ought to have known when he accepted the consideration, that part of his covenant was worthless and part good.

The Addyston Pipe & Steel Co. v. United States, 175 U. S. 211,* a case cited here by both parties, suggests such severance by judicial decree, though that was not the point decided.  The defendants, six in number, entered into a combination by which there was to be no competition between them in thirty-six states and territories, in the sale of cast-iron pipe.  The combination was declared illegal under the interstate commerce act, and all of defendants were enjoined by the court below.  The contract was not on its face severable.  Justice PECKHAM, who rendered the opinion affirming the judgment, said : "In one aspect however that judgment (of the court below) is too broad in its terms—the injunction is too absolute in its directions—as it may be construed as applying equally to commerce wholly within a state as well as to that interstate or international only. This was probably an inadvertence merely.  Although the jurisdiction of congress over commerce among the states is full and complete it is not questioned that it had none over that wholly within the state and therefore none over combinations and agreements so far as they relate to a restraint of such trade or commerce.  It does not acquire any jurisdiction over that part of a combination wholly within the state by reason of the fact that the agreement covers and relates to commerce which is interstate. . . . The combination herein described

---

* Also reported 20 Sup. Ct. Repr. 96.   Reporter.

covers both commerce which is wholly within a state and also that which is interstate. In regard to such of these defendants as might reside and carry on business in the same state, where the pipe provided for in any particular contract was to be delivered. . . . The statute would not be applicable to them. . . . To the extent that the present decree includes in its scope the enjoining of defendants thus situated from combining in regard to contracts for selling pipe in their own states it is modified and limited to that portion of the combination or agreement which is interstate in its character." We cite these remarks of Justice PECKHAM only as showing that an agreement, which on its face bound all, yet as to some was bad under the interstate commerce law. Because they only carried out the combination between themselves, residents of the same state, the court severed them in framing its decree from their colleagues in the agreement who had violated the law. The able counsel for appellant has advanced no convincing reason in his argument why the court below should be convicted of error in treating part of this contract as lawful and part as unlawful as it clearly is.

We discover nothing in the specifications of error which warrants further discussion; they are all overruled and the decree is affirmed.