## R. K. O. Distributing Corporation v. Shook

*William M. Rosenfield*, for plaintiff; *David J. Fanning*, for defendant.

CULVER, P. J., December 14, 1931.—This is an action of assumpsit, founded solely and exclusively upon a written contract, which is the uniform contract agreed upon by the Motion Picture Producers Association and which, since this contract was entered into, has been, by the Supreme Court of the United States, declared to be in violation of the Sherman Anti-Trust Act, and, therefore, illegal and void [Paramount Famous Lasky Corp. et al. *v.* United States, 282 U. S. 30].

Plaintiff and its associate members of the association with which it is affiliated, and the members of which association control practically the entire service possible to be obtained by theatre owners throughout the country, agreed upon a uniform contract which the theatre owners were compelled to execute in order to obtain service. By this arrangement the producers, having a monopoly of the business, were enabled to stifle competition and to fix whatever prices they saw fit for the services to be rendered, and the theatre owners and operators were compelled to pay these prices or close their theatres.

This action is not brought to recover for any services which the defendant received pursuant to said contract, as it is admitted in the pleadings that all services which the defendant received and used were paid for by him. This suit is brought to recover, not the damages which the plaintiff sustained by reason of the defendant refusing to carry out the contract and accept further services, but is brought to enforce the full price mentioned in the contract for the services which defendant refused to accept and did not accept or use.

The pleadings show that all services which were rendered under this illegal contract were paid for by the defendant. The defendant, having paid for all services which he received, refused to accept and pay for the remaining services provided in the contract. It is possible defendant could have raised the question now raised in the original affidavit of defense raising questions of law by him filed. However that may be, we are of opinion that the question is now properly raised in this affidavit of defense, wherein he sets forth, in effect, that the contract which plaintiff is seeking to enforce is not his contract, but is one which he was, by the unlawful combination of plaintiff and others, compelled to execute, as he was entirely at their mercy, and that the said contract, being one in restraint of trade, stifling all competition, and enabling plaintiff to fix its own prices, is an illegal one, and, therefore, unenforceable.

In order that this case may be finally disposed of upon this rule, counsel for plaintiff and defendant filed a stipulation in writing as follows:

"For the purpose of expediting the decision and ultimate disposition of the above case, counsel for the plaintiff and defendant stipulate that the court may consider the following in connection with the statement of claim and the affidavit of defense in the final decision upon the plaintiff's rule for judgment for insufficient affidavit of defense:

"1. The printed form of the contract in this case is identical with the standard exhibition contract discussed in the case of Paramount Famous Lasky Corp. et al. v. United States, 282 U. S, 30, and clause eighteen of this contract is identical with clause eighteen thereof.

"2. If the court shall find that the plaintiff may recover legally upon said contract, notwithstanding clause eighteen, then judgment shall be entered for the plaintiff for the amount claimed, otherwise for the defendant.

"3. Both parties reserve the right to appeal from the decision of the court in the above case.

"WM. ROSENFIELD,
"Attorney for Plaintiff.
"DAVID J. FANNING,
"Attorney for Defendant."

We understand from the explanation of counsel that this stipulation is intended to agree that all the facts existing in the case of Paramount Famous Lasky Corp. et al. v. United States, 282 U. S. 30, shall be considered by the court as agreed upon in this case, and if the court finds from these agreed facts that the contract upon which this case is founded is invalid as a whole, judgment shall be entered for the defendant, and if it be found divisible and legal in part, to the extent that action may be maintained upon it, judgment is to be entered for the plaintiff.

The defendant contends that the contract on which this case is based is one brought into existence by an illegal combination as found in the above-mentioned case; that it is a contract in restraint of trade, stifling competition and enabling the plaintiff to unlawfully and unjustly fix its own price, and is, therefore, illegal and unenforceable. The plaintiff replies:

"It is true the contract as a whole is forbidden by the Sherman Anti-Trust Act, and is illegal and void, but certain parts of it are not forbidden by the Sherman Anti-Trust Act, and, therefore, it can waive the illegal part of the contract and enforce the remainder thereof."

In other words, plaintiff's contention, as we construe it, is that, conceding the contract as a whole is unlawful and unenforceable, yet that part of it which is unlawful is only the arbitration agreement, and having now reaped the benefit of the arbitration agreement by fixing its own price and compelling the defendant to accept the same or close his theatre, it can now waive the illegal part and collect the price it so fixed in an action at law. As we interpret the opinion of the United States Supreme Court, the unlawful combination of the parties agreeing to deal only with such persons as would execute this uniform contract is a lever by which the theatre operators throughout the country were placed at the mercy of those engaged in producing motion pictures, being those same ones who were in such unlawful combination and agreement. In that case, Mr. Justice McReynolds, delivering the opinion of the Supreme Court, inter alia, said (pages 36-40):

"Appellants are the Paramount Famous Lasky Corporation and nine other corporations (distributors), producers and distributors throughout the Union of sixty per cent. of the films used for displaying motion pictures by some 25,000 theatre owners (exhibitors); the Motion Picture Producers and Distributors of America, a corporation with class 'B' membership composed of the above-mentioned distributors; and thirty-two film boards of trade, which severally function within certain defined regions.

"Each distributor produces and then distributes films through its own exchanges maintained in thirty-two centrally located cities—Albany, Atlanta, Chicago, Los Angeles, etc. Each of these exchanges has a manager, and under his supervision contracts are made for the use of his distributor's films within the designated territory or region and thereafter placed in the hands of the exhibitors. Other distributors, who, with appellants, control ninety-eight per cent. of the entire business, also have managers with like duties in the same cities. In each region all of these managers are associated through and constitute the entire membership of the local film board of trade.

"Under the common practice, in the spring, when most of the pictures are still only in contemplation, each distributor announces its intended program of distribution for twelve months. After this announcement, exhibitors are solicited to enter into written contracts for permission to display such of the pictures as they desire. And as no distributor can offer enough pictures to supply the average exhibitor's full requirement, he must deal with several.

"Under an agreement amongst themselves, appellant distributors will only contract with exhibitors according to the terms of the standard exhibition contract, dated May 1, 1928. Ordinarily, neither party gives security for compliance with such agreements by cash deposit or otherwise.

"This standard contract is an elaborate document, covering eight pages of the record. Under it the distributor licenses the exhibitor to display specified photoplays at a designated theatre on definite dates. Provision is made for cash payment three days in advance of any shipment, time and place of delivery, return of the prints, etc. Section eighteen . . . provides in substance that each party shall submit any controversy that may arise to a board of arbitration in the city where the distributor's exchange is located, established under and controlled by written rules adopted May 1, 1928; accept as conclusive the findings of this board; and forego the right to trial by jury." And further:

" 'In the event that the exhibitor shall fail or refuse to consent to submit to arbitration any claim or controversy arising under this or any other standard exhibition contract which the exhibitor may have with the distributor, or any other distributor, or to abide by and forthwith comply with any decision or award of such board of arbitration upon any such claim or controversy so submitted, the distributor may, at its option, demand, for its protection and as security for the performance by the exhibitor of this and all other existing contracts between the parties hereto, payment by the exhibitor of an additional sum not exceeding $500 under each existing contract, such sum to be retained by the distributor until the complete performance of all such contracts and then applied, at the option of the distributor, against any sums finally due or against any damages determined by said board of arbitration to be due to the distributor, the balance, if any, to be returned to the exhibitor; and in the event of the exhibitor's failure to pay such additional sum within seven days after demand, the distributor may by written notice to the exhibitor suspend service hereunder until said sum shall be paid and/or terminate this contract.' "

And, again, further said (page 41) :

"The record discloses that ten competitors in interstate commerce, controlling sixty per cent. of the entire film business, have agreed to restrict their liberty of action by refusing to contract for display of pictures except upon a standard form which provides for compulsory joint action by them in respect of dealings with one who fails to observe such a contract with any distributor, all with the manifest purpose to coerce the exhibitor and limit the freedom of trade.

"The United States maintain that the necessary and inevitable tendency of the outlined agreement and combination (described with greater detail in the opinion below) is to produce material and unreasonable restraint of interstate commerce in violation of the Sherman Act [15 U. S. C. A., Secs. 1-7, 15] : Eastern States Retail Lumber Dealers' Ass'n v. United States, 234 U. S. 600, 614 [34 S. Ct. 951, 58 L. Ed. 1490, L. R. A. 1915A, 788]; Binderup v. Pathé Exchange, 263 U. S. 291, 312 [44 S. Ct. 96, 68 L. Ed. 308]. The court below accepted this view and directed an appropriate injunction against future action under the unlawful plan. We agree with its conclusion and the challenged decree must be affirmed.

"The appellants claim: (1) The standard exhibition contract and rules of arbitration dated May 1, 1928, having been evolved after six years of discussion and experimentation, are reasonable and normal regulations; so that whatever restraint follows falls short of unlawful coercion; (2) arbitration is well adapted to the needs of the motion picture industry; (3) the manner in which the contract and rules have worked out in practice, and the significant absence of complaints, reflect their reasonable character; (4) the decree is inconsistent with the stipulated facts, also with the court's findings of fact.

" 'Founded upon broad conceptions of public policy, the prohibitions of the statute [Sherman Act] were enacted to prevent not the mere injury to an individual which would arise from the doing of the prohibited acts, but the harm to the general public which would be occasioned by the evils which it was contemplated would be prevented, and, hence, not only the prohibitions of the statute but the remedies which it provided were coextensive with such conceptions:' Wilder Mfg. Co. v. Corn Products, 236 U. S. 165, 174 [35 S. Ct. 398, 401, 59 L. Ed. 520]. 'The purpose of the Sherman Act is to prohibit monopolies, contracts and combinations which probably would unduly interfere with the free exercise of their rights by those engaged or who wish to engage in trade and commerce— in a word, to preserve the right of freedom to trade:' United States v. Colgate & Co., 250 U. S. 300, 307 [39 S. Ct. 465, 468, 63 L. Ed. 992, 7 A. L. R. 443]. 'The

fundamental purpose of the Sherman Act was to secure equality of opportunity and to protect the public against evils commonly incident to destruction of competition through monopolies and combinations in restraint of trade:' Ramsay Co. *v.* Bill Posters Ass'n, 260 U. S. 501, 512 [43 S. Ct. 167, 168, 67 L. Ed. 368].

" 'The Sherman Act was intended to secure equality of opportunity and to protect the public against evils commonly incident to monopolies and those abnormal contracts and combinations which tend directly to suppress the conflict for advantage called competition—the play of the contending forces ordinarily engendered by an honest desire for gain:' United States *v.* American Linseed Oil Co., 262 U. S. 371, 388 [43 S. Ct. 607, 611, 67 L. Ed. 1035]."

The plaintiff contends that only article eighteen of the contract, providing for arbitration, is illegal. We do not so construe the same. Article eighteen is the means whereby the illegal combination hamstrung the parties forced to execute such contract and enabled the plaintiff and the other companies combined in the unlawful agreement with it to stifle competition and fix prices, and it seems to us that to hold that, after the plaintiff has made use of the illegal part of the contract to compel the defendant to execute it and agree to pay the prices fixed by the plaintiff, which by its act had protected itself against competition, it may then say, having secured the execution of the contract, which is illegal in its entirety, "I will waive that portion of the contract which is no longer of service to me, the price having been fixed (and enforce collection of the prices so fixed in an action of law," would be, in effect, enabling the plaintiff to use the illegal contract in so far as it is of value to it and prevent the defendant from taking advantage of the illegal portion and would in effect nullify the decision of the United States Supreme Court in the case mentioned.

We are aware that courts have held this contract divisible and enforceable, and while we have the greatest respect for the opinions so holding, we are not convinced that those decisions are correct, and feel constrained from following them.

We have examined with care the cases of Smith's Appeal, 113 Pa. 579, and Monongahela River Consolidated Coal and Coke Co. *v.* Jutte, 210 Pa. 288, and do not construe these decisions as ruling plaintiff's contention to be correct. In the first-mentioned case, "A, for a valuable consideration, covenanted with B not to engage in the manufacture of ochre 'in the County of Lehigh or elsewhere.' "

He afterwards did engage in manufacturing in Lehigh County, and the court held that the restriction as to Lehigh County was not unreasonable and was, therefore, enforceable.

The principle of the case, as we construe it, is that when a person upon a valid consideration agrees to do two things, one of which is legal and the other illegal, he shall be compelled to do that which is legal unless the two are so mingled together that they cannot be separated, in which case the whole premise is void, and the same is the principle ruled in Monongahela, etc., Co. *v.* Jutte. In that case, defendant, in consideration of a very large amount of money, sold coal land, boats, etc., to the plaintiff and agreed not to engage directly or indirectly in the business of mining, marketing or shipping coal in the territory traversed by the Monongahela, Ohio and Mississippi Rivers and their tributaries for a period of ten years from the date of the agreement. The Supreme Court held that the agreement was a reasonable contract and not contrary to the public policy of Pennsylvania, where it was made and where it was being enforced, notwithstanding the fact that the plaintiff had a similar contract with a large number, although not all, of the coal operators and shippers doing business in the Monongahela Valley in Pennsylvania. Discussing the Northern Securities case, after stating the facts, the court said:

"This, practically, would enable the holding company to pursue a policy which would benefit all the constituent companies at the expense of the public, take away all inducement to competition between them and be a virtual monopoly of interstate and foreign commerce theretofore carried on by competitors."

That is practically what the combination of the various companies who agreed upon the contract in question accomplished in the motion picture field. The case of Monongahela, etc., Co. *v.* Jutte, supra, was decided on the ground that the stipulation agreed to was not void because contrary to public policy, and that, in so far as it related to territory within Pennsylvania, it was enforceable by the courts of Pennsylvania—that it was not prohibited by the Sherman Anti-Trust Act. The court quoted with approval the language of Mr. Justice Harlan as follows:

"In our judgment, the evidence fully sustains the material allegations of the bill and shows a violation of the Act of Congress, in so far as it declares illegal every combination or conspiracy in restraint of commerce among the several states and with foreign nations, and forbids attempts to monopolize such commerce or any part of it," and then immediately said:

"The facts and the inferences from them in that case, popularly known as the Northern Securities Company case, are distinctly different from those in the case before us."

In Monongahela, etc., Co. *v.* Jutte, supra, the court further said "quoting from the opinion of the court below):

" 'We see nothing unreasonable in an agreement connected with the sale of the good will of the mining business in that district to remain out of the business of mining and shipping coal in such a district, although there were parts of the district in which the defendant did not actually operate mines or ship coal.'

"This conclusion only bears directly on the reasonableness of the restriction, at the same time the limited territory in which it may be enforced is designated; but in the second conclusion of law the court says:

" 'It is contended, however, by the defendant, that the stipulation is divisible, and that even if it is void as applied to the largest extent of territory described, it is not invalid as to parts of it. There is no question that such contracts are divisible and that one part or stipulation thereof may be void while the other is not.' "

The above-mentioned case of Monongahela, etc., Co. *v.* Jutte, in our judgment, is not authority for the instant case. In that case the findings of fact by the court below, upon which the Supreme Court acted, and the conclusions of law of the court below, which were affirmed by the Supreme Court, both show clearly and conclusively that all the case decides is that the contract as a whole was void and forbidden by the Sherman Anti-Trust Act and any attempt to enforce it in the entire territory embraced therein would be restrained by an injunction, but the restriction as to the mining and shipping of coal along the Monongahela River and wholly within the Commonwealth of Pennsylvania, under the facts of the contract, was not unreasonable and was not forbidden by the Sherman Anti-Trust Act, because an enforcement of it within the boundaries of Pennsylvania eliminated the interstate question.

In the latter part of the opinion by Judge Shafer in the court below, at page 295, we find the following:

"It is true that, in fact, the plaintiff company does not market or ship coal except that which it mines, but the language of the contract is sufficient to cover all marketing and shipping of coal whatsoever. We are, therefore, of opinion that the contract, so far as it prohibits the marketing and shipping of coal between or within the states on the Monongahela River, is made void by the Act

of Congress. This, however, does not affect the validity of the contract so far as marketing and shipping coal within the State of Pennsylvania is concerned."

The contract which we have to consider in the instant case is one that has already been declared by the United States Supreme Court to be invalid, because it was brought into existence by a criminal combination forbidden by the Sherman Anti-Trust Law.

Our attention has been called to the case of Vitagraph, Inc., v. Third Street Theatre Co., 23 Northamp. Co. R. 85, decided in the Court of Common Pleas of Northampton County by Judge Stewart. We do not construe this case as ruling the case at bar, as Judge Stewart simply ruled that the case on the pleadings did not justify entering judgment for the defendant, expressly saying (page 99):

"It may be that upon the trial of this case, after the facts are fully developed and are in the record, it will come under the Connolly case, supra [Connolly v. Union Sewer Pipe Co., 184 U. S. 540], or it may be ruled by the Continental Wall Paper Company case, supra [Continental Wall Paper Co. v. Voight, 212 U. S. 227]. At present, we do not feel that judgment can be entered on this record for the defendant."

When the instant case was first argued, we suggested to counsel for plaintiff and defendant that on the pleadings in the case the court could not determine whether the defense set up should be sustained or not and suggested, in order to avoid the expense of establishing the facts, which were established in the case of Paramount Famous Lasky Corp. et al. v. United States, 282 U. S. 30, 51 Supreme Court Reporter 42, decided November 24, 1930, long after the contract in question was executed, that counsel should stipulate of record that the facts established in that case should be considered as agreed to in this case, whereupon the court could render a decision that would save the expense of a long and tedious trial, and for that purpose the stipulation above referred to was made and filed of record in the case.

In Vitagraph, Inc., v. Theatre Realty Co., Inc., 50 F. (2d) 907, in the District Court of the United States for the Eastern District of Pennsylvania, Judge Dickinson, in discussing this question, said:

"When confronted with the writing averred in the statement of claim to be the contract of the defendant, it says it is not its contract because it is nothing, being avoided by the policy of the law. The real defense is to be found in the feature that the plaintiff is in a position to control the trade of its customers. It says, in effect, you must sign this contract on the dotted line or go out of business. A contract includes the thought of the freedom of the contracting parties. It would be farcical to speak of freedom under such conditions. The proposition is, therefore, simply that a plaintiff cannot enforce a contract which is void because condemned by the law. . . . The sole question now raised is whether the plaintiff can enforce a contract which is not enforceable at law or in equity. The ruling made is that it cannot. So far as we have noticed, the statement of claim bases the cause of action wholly upon the contract, and it follows that if there is no contract the cause of action is without support."

In Fox Film Corp. v. Tri-State Theatres, in the District Court of the Tenth Judicial District of the State of Idaho, affirmed in 51 Idaho 439, 6 Pac. (2d) 135, Judge Johnson, in discussing the contract in question, said:

"The court is of the opinion that any contract which is a violation of the Sherman Anti-Trust Act, and the making of which is a crime, cannot be enforced between the parties, especially so when the action is not to recover the payment for an article furnished but for damages for failure to accept or use other films provided for in the illegal contract. The demurrer is, therefore, sustained, and

the court feels that since the action is dependent upon the illegal contract it should be dismissed."

We are not convinced that the arbitration clause, which is article eighteen of the contract, is the only part of the contract that is illegal under the decision of the United States Supreme Court. By virtue of all the provisions in this contract, including the arbitration clause, plaintiff, with its associates in the unlawful combination, destroyed all competition and controlled the service which theatre owners must have in order to keep their theatres open. By this means it was enabled to fix the price as it saw fit and defendant could pay that price or close his theatre. To us it appears that such a contract is condemned by law and unenforceable. If we are correct in this, it follows that, inasmuch as plaintiff's cause of action is based solely upon the condemned contract, which contains a clause to the effect that there is no other oral or verbal understanding or agreement, there is nothing to support plaintiff's claim, and judgment should be entered in favor of the defendant under the provisions of section twenty of the Practice Act of 1915.

### Order

And now, to wit, December 14, 1931, after due and careful consideration of this case, the pleadings and the agreement as to facts to be considered by the court filed by counsel representing plaintiff and defendant and made a part of the record, plaintiff's rule for judgment for want of a sufficient affidavit of defense is discharged, and judgment is entered in favor of the defendant upon the ground that the contract upon which plaintiff bases its cause of action is illegal and void. An exception is noted for plaintiff and a bill sealed.

From Rodney A. Mercur, Towanda, Pa.