ARKANSAS BROKERAGE CO. et al. v. DUNN & POWELL, Inc.†

(Circuit Court of Appeals, Eighth Circuit.    October 25, 1909.)

No. 2,916.

MONOPOLIES (§ 17*)—COMBINATIONS IN RESTRAINT OF INTERSTATE COMMERCE— COMBINATION PROHIBITED.

> The organization by a number of mercantile jobbers located in the same city of a brokerage company, of which they owned the stock, and the purchase of merchandise required by them from manufacturers and jobbers in other states through such company, instead of through other brokers previously patronized, although there was no agreement binding them to do so, and the use of their influence to extend its business, did not constitute a combination or conspiracy in restraint of interstate trade or commerce, or to monopolize the same, in violation of the Sherman anti-trust act (Act July 2, 1890, c. 647, §§ 1, 2, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]), but was a legitimate and lawful business enterprise.

> [Ed. Note.—For other cases, see Monopolies, Dec. Dig. § 17.*]

In Error to the Circuit Court of the United States for the Eastern District of Arkansas.

Action by Dunn & Powell, Incorporated, against the Arkansas Brokerage Company and others. Judgment for plaintiff, and defendants bring error. Reversed.

Charles T. Coleman and W. T. Wooldridge (Frank G. Bridges, N. J. Gannt, Jr., George W. Murphy, and W. M. Lewis, on the brief), for plaintiffs in error.

J. W. House (M. House, on the brief), for defendant in error.

Before ADAMS, Circuit Judge, and RINER and AMIDON, District Judges.

ADAMS, Circuit Judge   This was an action at law to enforce liability for threefold damages created by the seventh section of the anti-trust act (Act July 2, 1890, c. 647, 26 Stat. 210 [U. S. Comp. St. 1901, p. 3202]). Dunn & Powell, a corporation engaged in the merchandise brokerage and commission business, with its chief office in Little Rock and a branch office in Pine Bluff, Ark., charged the defendants the Arkansas Brokerage Company and five other domestic corporations doing business in Pine Bluff, together with two foreign corporations doing business in other states, with entering into a combination and conspiracy in restraint of trade and commerce among the states, and with monopolizing such trade and commerce, in violation of sections 1 and 2 of that act, and thereby injuring the plaintiff's business. The facts disclosed by the pleadings and proof are substantially these:

Plaintiff had been for many years prior to 1906 conducting a lucrative brokerage business in Pine Bluff, by negotiating sales of merchandise between manufacturers and wholesale dealers of other states and jobbers doing business in that region, and had built up in its branch office at that place a profitable business. In the year 1906 the five domestic corporations, constituting substantially all the jobbers in Pine Bluff, concluded to organize and did organize a corporation to do their own brokerage business, as well as that of any others which it might

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes
† Rehearing denied December 4, 1909.

secure. Each of them took and paid for two shares of its capital stock, which they caused to be issued to one of their officers or members as their representatives, and this constituted all of its stock, excepting two shares, which were sold to one Russell, who was chosen to be manager of the new corporation. Practically speaking, therefore, the wholesale business houses of Pine Bluff organized, owned, and operated the new corporation, which was named the Arkansas Brokerage Company, the main defendant herein. The other defendants were the five domestic corporations and two manufacturing corporations of other states, all of whom were alleged to be parties with the new brokerage company to the combination and conspiracy. While there was no agreement or understanding that the defendants the Pine Bluff jobbers should cease dealing with the plaintiff, they naturally enough preferred to deal and did deal with the brokerage company after its organization, and gave preference to it in the conduct of their business. There is evidence that those jobbers would not purchase through the plaintiff's agency, unless it would quote prices sufficiently low to neutralize the advantages they would secure by making their purchases through their own agency. The fact also appears that some foreign manufacturers, deciding that their business interests would be better served thereby, ceased to employ plaintiff, and voluntarily placed their accounts with the brokerage company. There was such a failure, however, to connect the foreign corporations which were made defendants to this suit in any improper, unfair, or unlawful way with the other and main defendants that the court at the close of the case directed a verdict in their favor, and no complaint is made of that action by the plaintiff.

While the bill of complaint and argument of plaintiff's counsel abound in repeated and diversely stated charges of confederacy, conspiracy, and unlawful contrivances to bring about the destruction of plaintiff's business and to appropriate it by the defendants, the proof, as we gather it from a patient and careful reading of the record, discloses but few actual and material facts. The five jobbers undoubtedly conceived a purpose to save the brokerage charges, which they had before then been required to pay, by negotiating their purchases through their own agency, and at the same time inaugurate and conduct another branch of business. By reason of their advantageous situation as jobbers who furnished a large part of the brokerage business of Pine Bluff, and by dint of business sagacity and industry, their new brokerage company was able to outstrip most of its competitors, including the plaintiff, and as a result the latter soon abandoned its branch office in Pine Bluff and ceased doing business there. There is little, if any, competent evidence of unfair competition by the brokerage company, unless it be in the fact that it secured the trade of its own stockholders and availed itself of their valuable influence for the extension and success of its business. To pronounce such action unfair and unlawful would disrupt many existing business corporations and effectually prevent the organization of any more. It would contravene one, if not the chief, reason for their creation or existence.

The contention of the plaintiff is therefore reduced to this: That the defendant jobbers wronged the plaintiff by arranging to do for

themselves what they had formerly employed it to do for them, and that the brokerage company wronged the plaintiff by availing itself of all its opportunities and favorable conditions for successful competition in a branch of business legitimately open to all comers. We agree fully with certain propositions of law urged by plaintiff's learned counsel in support of their contentions in this case, namely: (1) That the anti-trust act denounces as illegal any contract, combination, or conspiracy of whatever form or nature which directly or necessarily operates to restrain or obstruct the free flow of commerce between the states, and that this denunciation includes contracts, combinations, or conspiracies to restrain the liberty of a trader in such commerce to engage or continue therein. Loewe v. Lawlor, 208 U. S. 274, 28 Sup. Ct. 301, 52 L. Ed. 488, and cases cited. (2) That any such contract, combination, or conspiracy which directly restrains the purchase, sale, or exchange of manufactured commodities among the several states is illegal. Addyston Pipe and Steel Co. v. United States, 175 U. S. 211, 20 Sup. Ct. 96, 44 L. Ed. 136. (3) That the destruction, restriction, or stifling of free competition in trade and commerce among the states constitutes a restraint of that trade, and is within the inhibition of the statute. Northern Securities Co. v. United States, 193 U. S. 197, 24 Sup. Ct. 436, 48 L. Ed. 679. (4) That a broker, acting for individuals or firms doing business in one state, when soliciting or taking orders for the sale and delivery of their merchandise to jobbers or dealers located in other states, is in so doing engaged in interstate commerce. Robbins v. Shelby Taxing District, 120 U. S. 489, 7 Sup. Ct. 592, 30 L. Ed. 694; Asher v. Texas, 128 U. S. 129, 9 Sup. Ct. 1, 32 L. Ed. 368.

But it is not perceived how the principles so invoked apply to the facts of this case or control its decision. The organization of the brokerage company as a competitor in business open to all had no natural tendency to directly or necessarily restrain commerce between the states, and the proof fails to show that it actually did restrain, lessen, or in any way stifle its free flow. The volume of that commerce, after as well as before the organization of the brokerage company, was determined by the fixed economic laws of demand and supply. The whole field was open to competition, and while the plaintiff, whose chief place of business was elsewhere, and one other broker in Pine Bluff, soon abandoned it, others operating there and in that vicinity remained in active competition, and without doubt all together were able and zealously disposed to keep the wheels of commerce as active as the demand for foreign merchandise required. Any one who had been in the business before could remain in it, and any one who wished to enter it afterwards could freely do so; but they had necessarily to compete with others, including the brokerage company, with whatever advantages they possessed for conducting a prosperous business. The fortuitous circumstance that the brokerage company had five important jobbers in the city so situated as to give it a preference arose from strictly legitimate relations. No one can deny that the jobbers had a right to organize a corporation to do their own brokerage business, as well as that of others. The law gave them that right, and they availed themselves of its provisions for that purpose. It cannot be doubted that

the five jobbers could have given their brokerage business to any broker on terms to be agreed upon, and it seems equally clear that by participating in the organization and ownership of the brokerage company they did no more than this, if indeed as much; for there was no obligation, express or implied, requiring them to deal with the brokerage company, except and so far only as their best interests from time to time dictated.

The mere fact that the broker, while engaged in negotiating sales of merchandise between an owner in one state and a jobber or consumer in another, is engaged in a species of interstate commerce, is quite unimportant, provided the business be done in a lawful manner. It becomes unlawful only when it is so done as to directly and substantially restrain that commerce or stifle its free flow. The proof, in our opinion, affords no warrant for a finding that any such consequences actually flowed, or had a natural tendency to flow, from the organization complained of in this case. The principles announced in the two cases of Hopkins v. United States, 171 U. S. 578, 19 Sup. Ct. 40, 43 L. Ed. 290, and Anderson v. United States, 171 U. S. 604, 19 Sup. Ct. 50, 43, L. Ed. 300, fully sustain the conclusions we have reached in this case. In the latter case the court said:

"It has already been stated, in the Hopkins Case above mentioned, that in order to come within the provisions of the statute the direct effect of an agreement or combination must be in restraint of that trade or commerce which is among the several states or with foreign nations. Where the subject-matter of the agreement does not directly relate to, act upon, and embrace interstate commerce, and where the undisputed facts clearly show that the purpose of the agreement was not to regulate, obstruct, or restrain that commerce, but that it was entered into with the object of properly and fairly regulating the transaction of the business in which the parties to the agreement were engaged, such agreement will be upheld as not within the statute, where it can be seen that the character and terms of the agreement are well calculated to attain the purpose for which it was formed, and where the effect of its formation and enforcement upon interstate trade or commerce is in any event but indirect and incidental, and not its purpose or object."

In Field v. Barber Asphalt Co., 194 U. S. 618, 24 Sup. Ct. 784, 48 L. Ed. 1142, the court said:

"In this day of multiplied means of intercourse between the states, there is scarcely any contract which cannot in a limited or a remote degree be said to affect interstate commerce. But it is only direct interference with the freedom of such commerce that brings the case within the exclusive domain of federal legislation."

This court, in Phillips v. Iola Portland Cement Co., 125 Fed. 593, 61 C. C. A. 19, said:

"This act of Congress [anti-trust act] must have a reasonable construction. It was not its purpose to prohibit or to render illegal the ordinary contracts or combinations of manufacturers, merchants, and traders, or the usual devices to which they resort to promote the success of their business to enhance their trade, and to make their occupations gainful, so long as those combinations and devices do not necessarily have a direct and substantial effect to restrict competition in commerce among the states."

See, also, Whitwell v. Continental Tobacco Co., 125 Fed. 454, 60 C. C. A. 290, 64 L. R. A. 689.

From these cases, and many others to which attention might be called, it seems clear that the Pine Bluff jobbers merely resorted to a common

expedient, recognized by law and sanctioned by practice, of forming a subsidiary corporation to promote economy in the management of their existing business and to extend it into other fields of legitimate enterprise. If the new expedient affected interstate commerce at all, it was not in that direct, immediate, or necessary way which alone would make it obnoxious to the law, but only in an indirect, incidental, and unimportant way not within the denunciation of the law. The worst that can be said is that the parties availed themselves of certain advantages and opportunities which their relation to the brokerage business gave them and which materially aided them in the race of competition. If this resulted in injury to the plaintiff, it was damnum absque injuria. Free competition is the life of trade and commerce, and it is quite as important to approve all lawful, fair, and reasonable expedients devised to promote individual success as it is to condemn vicious and unlawful practices which violate individual right and the public weal.

The learned trial judge should have given the requested instruction to the jury that plaintiff was not entitled to recover. The judgment is therefore reversed, and the cause remanded to the Circuit Court for a new trial in harmony with the views here announced.