## PARAMOUNT FAMOUS LASKY CORPORATION ET AL. *v.* UNITED STATES.

No. 83. Argued October 27, 1930.—Decided November 24, 1930.

*Messrs. Cornelius W. Wickersham* and *John W. Davis*, with whom *Messrs. Henry W. Taft, Paxton Blair, Arthur L. Fisk, Jr.,* and *Gabriel L. Hess* were on the brief, for appellants.

Assistant to the Attorney General *O'Brian,* with whom *Attorney General Mitchell* and *Messrs. Claude R. Branch, Charles H. Weston,* and *C. Stanley Thompson,* Special Assistants to the Attorney General, were on the brief, for the United States.

MR. JUSTICE MCREYNOLDS delivered the opinion of the Court.

By this proceeding the United States seek to prevent further violation of Section 1, Act of Congress approved July 2, 1890 (Sherman Act), c. 647, 26 Stat. 209, through an alleged combination and conspiracy to restrain interstate commerce in motion picture films.

Appellants are the Paramount Famous Lasky Corporation and nine other Corporations (Distributors), producers and distributors throughout the Union of sixty per cent of the films used for displaying motion pictures by some 25,000 theatre owners (Exhibitors); the Motion Picture Producers and Distributors of America, a corporation with class "B" membership composed of the above-mentioned Distributors; and thirty-two Film Boards of Trade, which severally function within certain defined Regions.

Each Distributor produces and then distributes films through its own exchanges maintained in thirty-two centrally located cities—Albany, Atlanta, Chicago, Los Angeles, etc. Each of these exchanges has a manager and under his supervision contracts are made for the use of

his Distributor's films within the designated territory or region and thereafter placed in the hands of the Exhibitors. Other Distributors, who with Appellants control 98% of the entire business, also have managers with like duties in the same cities. In each Region all of these managers are associated through and constitute the entire membership of the local Film Board of Trade.

Under the common practice, in the Spring, when most of the pictures are still only in contemplation, each Distributor announces its intended program of distribution for twelve months. After this announcement Exhibitors are solicited to enter into written contracts for permission to display such of the pictures as they desire. And as no Distributor can offer enough pictures to supply the average Exhibitor's full requirement, he must deal with several.

Under an agreement amongst themselves Appellant Distributors will only contract with Exhibitors according to the terms of the Standard Exhibition Contract, dated May 1, 1928. Ordinarily neither party gives security for compliance with such agreements, by cash deposit or otherwise.

This Standard Contract is an elaborate document, covering eight pages of the record. Under it the Distributor licenses the Exhibitor to display specified photo plays at a designated theatre on definite dates. Provision is made for cash payment three days in advance of any shipment, time and place of delivery, return of the prints, etc., etc. Section 18 (copied in the margin)* provides in substance that each party shall submit any controversy that may

---

*Eighteenth. The parties hereto agree that before either of them shall resort to any court to determine, enforce or protect the legal rights of either hereunder, each shall submit to the Board of Arbitration (established or constituted pursuant to the Rules of Arbitration filed with the American Arbitration Association, 342 Madison Avenue, New York City, bearing date May 1, 1928 and identified by the sig-

arise to a Board of Arbitration, in the city where the Distributor's Exchange is located, established under and controlled by written rules adopted May 1, 1928; accept as conclusive the findings of this Board; and forego the right to trial by jury. And further:

" In the event that the Exhibitor shall fail or refuse to consent to submit to arbitration any claim or controversy arising under this or any other Standard Exhibition Con-

natures of. the Contract Committee appointed at the 1927 Motion Picture Trade Practice Conference, a copy of which will be furnished to the Exhibitor upon request in the city wherein is situated the exchange of the Distributor from which the Exhibitor is served or if there be no such Board of Arbitration in such city then to the Board of Arbitration in the city nearest thereto (unless the parties hereto agree in writing that such submission shall be made to a Board of Arbitration located in another specified city), all claims and controversies arising hereunder for determination pursuant to the said Rules of Arbitration and the rules of procedure and practice adopted by such Board of Arbitration.

The parties hereto further agree to abide by and forthwith comply with any decision and award of such Board of Arbitration in any such arbitration proceeding, and agree and consent that any such decision or award shall be enforceable in or by any court of competent jurisdiction pursuant to the laws of such jurisdiction now or hereafter in force; and each party hereto hereby waives the right of trial by jury upon any issue arising under this contract, and agrees to accept as conclusive the findings of fact made by any such Board of Arbitration, and consents to the introduction of such findings in evidence in any judicial proceeding.

In the event that the Exhibitor shall fail or refuse to consent to submit to arbitration any claim or controversy arising under this or any other Standard Exhibition Contract which the Exhibitor may have with the Distributor or any other distributor or to abide by and forthwith comply with any decision or award of such Board of Arbitration upon any such claim or controversy so submitted, the Distributor may, at its option, demand, for its protection and as security for the performance by the Exhibitor of this and all other existing contracts between the parties hereto, payment by the Exhibitor of an additional sum not exceeding $500 under each existing contract, such sum to be retained by the Distributor until the complete performance

tract which the Exhibitor may have with the Distributor or any other distributor or to abide by and forthwith comply with any decision or award of such Board of Arbitration upon any such claim or controversy so submitted, the Distributor may, at its option, demand, for its protection and as security for the performance by the Exhibitor of this and all other existing contracts between the parties hereto, payment by the Exhibitor of an additional sum not exceeding $500 under each existing contract, such sum to

of all such contracts and then applied, at the option of the Distributor, against any sums finally due or against any damages determined by said Board of Arbitration to be due to the Distributor, the balance if any to be returned to the Exhibitor; and in the event of the Exhibitor's failure to pay such additonal sum within seven (7) days after demand, the Distributor may by written notice to the Exhibitor suspend service hereunder until said sum shall be paid and/or terminate this contract.

In the event that the Distributor shall fail or refuse to consent to the submission to arbitration of any claim or controversy arising under this or any other Standard Exhibition Contract providing for arbitration which the Distributor may have with the Exhibitor, or to abide by and forthwith comply with any decision or award of such Board of Arbitration upon any such claim or controversy so submitted, within the number of days specified in Article Twenty-Second opposite the name of the City in which such Board of Arbitration is located, the Exhibitor may at his option terminate this and any other existing contract between the Exhibitor and the Distributor by mailing notice by registered mail within two (2) weeks after such failure or refusal, and in addition the Distributor shall not be entitled to redress from such Board of Arbitration upon any claim or claims against any exhibitor until the Distributor shall have complied with such decision, and in the meanwhile the provisions of the first paragraph of this Article Eighteenth shall not apply to any such claim or claims.

Any such termination by either party, however, shall be without prejudice to any other right or remedy which the party so terminating may have by reason of any such breach of contract by the other party.

The provisions of this contract relating to arbitration shall be construed according to the law of the State of New York.

be retained by the Distributor until the complete perform-
ance of all such contracts and then applied, at the option
of the Distributor, against any sums finally due or against
any damages determined by said Board of Arbitration to
be due to the Distributor, the balance, if any to be re-
turned to the Exhibitor; and in the event of the Exhibi-
tor's failure to pay such additional sum within seven
(7) days after demand, the Distributor may by written
notice to the Exhibitor suspend service hereunder until
said sum shall be paid and/or terminate this contract."

The Rules of Arbitration provide for a Board, three of
whom shall be members of the local Film Board of Trade
and three proprietors or managers of theatres in its region.
This Arbitration Board shall have power to determine the
controversy, make findings, direct what shall be done with
respect to the dispute; "and shall fix the maximum
amount" (not exceeding $500) which each Distributor
may demand as security pursuant to the arbitration clause
in the event of the failure of the Exhibitor to submit to
arbitration or to comply with the award. The secretary
of the Board of Arbitration is required to notify the secre-
tary of the Film Board of Trade of the name and address
of each Exhibitor found to have refused to arbitrate or
comply with an award, and the maximum amount of
security (not above $500) found by the Board. "On
receipt of any such notice, each member having a contract
(or representing a distributor having a contract) contain-
ing the arbitration clause with any such exhibitor shall
demand payment by such exhibitor of such sum as in the
judgment of such member or distributor shall be suf-
ficient to protect such member or distributor in the per-
formance of each contract with such exhibitor. Said
sum shall not exceed the actual value of any print there-
after to be delivered under each such contract plus the
maximum amount fixed by the Board of Arbitration as

aforesaid. Thereafter each distributor (represented in the membership) to whom such exhibitor shall have failed within seven (7) days to pay the amount of security so demanded by such distributor shall proceed to suspend service under each such contract until such exhibitor shall have furnished such security or complied with the decision of such Arbitration Board. If service under any such contract shall be so suspended for a period of ten days such contract, at the option of the distributor, may then be cancelled. No member or distributor having so suspended service under any such contract with such exhibitor shall thereafter resume service under any such contract unless and until such exhibitor shall have furnished said security to such member or distributor or shall have complied with the decision of the Arbitration Board. Upon the happening of either of such events service under such contract shall be promptly resumed by such member or distributor."

The record discloses that ten competitors in interstate commerce, controlling sixty per cent of the entire film business, have agreed to restrict their liberty of action by refusing to contract for display of pictures except upon a Standard Form which provides for compulsory joint action by them in respect of dealings with one who fails to observe such a contract with any Distributor, all with the manifest purpose to coerce the Exhibitor and limit the freedom of trade.

The United States maintain that the necessary and inevitable tendency of the outlined agreement and combination (described with greater detail in the opinion below) is to produce material and unreasonable restraint of interstate commerce in violation of the Sherman Act. *Eastern States Lumber Assn.* v. *United States,* 234 U. S. 600, 614; *Binderup* v. *Pathe Exchange,* 263 U. S. 291, 312. The court below accepted this view and directed an ap-

propriate injunction against future action under the unlawful plan. We agree with its conclusion and the challenged decree must be affirmed.

The Appellants claim: (1) The Standard Exhibition Contract and Rules of Arbitration dated May 1, 1928, having been evolved after six years of discussion and experimentation, are reasonable and normal regulations; so that whatever restraint follows falls short of unlawful coercion. (2) Arbitration is well adapted to the needs of the motion picture industry. (3) The manner in which the Contract and Rules have worked out in practice, and the significant absence of complaints, reflect their reasonable character. (4) The decree is inconsistent with the stipulated facts, also with the Court's findings of fact.

" Founded upon broad conceptions of public policy, the prohibitions of the statute [Sherman Act] were enacted to prevent not the mere injury to an individual which would arise from the doing of the prohibited acts, but the harm to the general public which would be occasioned by the evils which it was contemplated would be prevented, and hence not only the prohibitions of the statute but the remedies which it provided were co-extensive with such conceptions." *Wilder Mfg. Co.* v. *Corn Products Co.*, 236 U. S. 165, 174. " The purpose of the Sherman Act is to prohibit monopolies, contracts and combinations which probably would unduly interfere with the free exercise of their rights by those engaged, or who wish to engage, in trade and commerce—in a word to preserve the right of freedom to trade." *United States* v. *Colgate & Co.*, 250 U. S. 300, 307. " The fundamental purpose of the Sherman Act was to secure equality of opportunity and to protect the public against evils commonly incident to destruction of competition through monopolies and combinations in restraint of trade." *Ramsay Co.* v. *Bill Posters Assn.*, 260 U. S. 501, 512. " The Sherman Act was in-

tended to secure equality of opportunity and to protect the public against evils commonly incident to monopolies and those abnormal contracts and combinations which tend directly to suppress the conflict for advantage called competition—the play of the contending forces ordinarily engendered by an honest desire for gain." *United States v. American Oil Co.*, 262 U. S. 371, 388.

The fact that the Standard Exhibition Contract and Rules of Arbitration were evolved after six years of discussion and experimentation does not show that they were either normal or reasonable regulations. That the arrangement existing between the parties cannot be classed among "those normal and usual agreements in aid of trade and commerce" spoken of in *Eastern States Lumber Assn. v. United States, supra*, 612, is manifest. Certainly it is unusual and we think it necessarily and directly tends to destroy "the kind of competition to which the public has long looked for protection." *United States v. American Oil Co., supra*, 390.

The Sherman Act seeks to protect the public against evils commonly incident to the unreasonable destruction of competition and no length of discussion or experimentation amongst parties to a combination which produces the inhibited result can give validity to their action. Congress has so legislated "as to prevent resort to practices which unduly restrain competition or unduly obstruct the free flow of such commerce, and private choice of means must yield to the national authority thus exerted." *Eastern States Lumber Assn. v. United States, supra*, 613.

It may be that arbitration is well- adapted to the needs of the motion picture industry; but when under the guise of arbitration parties enter into unusual arrangements which unreasonably suppress normal competition their action becomes illegal.

In order to establish violation of the Sherman Act it is not necessary to show that the challenged arrangement suppresses all competition between the parties or that the parties themselves are discontented with the arrangement. The interest of the public in the preservation of competition is the primary consideration. The prohibitions of the statute cannot " . . . be evaded by good motives. The law is its own measure of right and wrong, of what it permits, or forbids, and the judgment of the courts cannot be set up against it in a supposed accommodation of its policy with the good intention of parties, and it may be, of some good results." *Standard Sanitary Mfg. Co.* v. *United States,* 226 U. S. 20, 49.

Upon examination of the record we cannot say that the decree of the court below is inconsistent with the stipulated facts or with proper regard to what that court held in respect of the facts.

The challenged decree must be

*Affirmed.*