## PRAIRIE FARMER PUB. CO. et al. v. INDIANA FARMER'S GUIDE PUB. CO.*
### No. 5646.

Circuit Court of Appeals, Seventh Circuit.
March 23, 1937.

*Writ of certiorari denied 57 S.Ct. 925, 81 L.Ed. ——

980

Maxwell V. Beghtol, of Lincoln, Neb., and Burke G. Slaymaker, of Indianapolis, Ind., for appellants.

Eben Lesh, of Huntington, Ind., for appellee.

Before EVANS and SPARKS, Circuit Judges, and LINDLEY, District Judge.

LINDLEY, District Judge.

The nature of this litigation is fully disclosed in prior decisions: Indiana Farmer's Guide Pub. Co. v. Prairie Farmer Pub. Co. et al., 70 F.(2d) 3 (C.C.A.7); Indiana Farmer's Guide Pub. Co. v. Prairie Farmer Pub. Co. et al., 293 U.S. 268, 55 S.Ct. 182, 79 L.Ed. 356; Prairie Farmer Pub. Co. et al. v. Indiana Farmer's Guide Pub. Co., 82 F.(2d) 704 (C.C.A.7); Prairie Farmer Pub. Co. et al. v. Indiana Farmer's Guide Pub. Co., 299 U.S. 156, 57 S.Ct. 135, 81 L.Ed. ——, December 7, 1936. It having been authoritatively established that the complaint stated a good cause of action under the Sherman Anti-Trust Act (15 U.S.C.A. §§ 1–7, 15 note) and a verdict having been returned in favor of appellee, there remains for determination by this court the question of whether the evidence was sufficient to sustain the verdict.

The material and pertinent facts are partially outlined in the decisions above mentioned. It is necessary, however, to examine the evidence in greater detail in order to determine satisfactorily the question confronting us, for a cause must be submitted to the jury unless the testimony is of such conclusive character as to require the court to set aside a verdict in opposition to it. Phoenix Mut. Life Insurance Co. v. Doster, 106 U.S. 30, 1 S.Ct. 18, 27 L.Ed. 65. In other words, it is the duty of the trial judge to take that view of the evidence most favorable to the prevailing party. Not only must the court assume that such party's evidence is true, but it must also extend credit to every fair inference therefrom. Contradictions in testimony do not vary the rule, for the credibility of witnesses is a question for the jury. Shadoan v. Cincinnati, etc., Ry. Co. (C.C.A.) 220 F. 68. The inquiry, then, is whether plaintiff's evidence, unaffected by questions of credibility, is sufficient to support a verdict in a civil action brought to recover damages for violation of sections 1 and 2 of the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1, 2.

Appellee published in Indiana a state farm paper, the Indiana Farmer's Guide, which circulates in that state and to a lesser degree in neighboring states. Appellants published papers of the same character in the eight states constituting in common parlance the corn belt. Specifical-

ly the Prairie Farmer Company published a similar paper in Illinois and for some years past has published a special edition for circulation principally in Indiana, called "The Prairie Farmer, Indiana Edition." Prior to that time, this appellant covered both Illinois and Indiana with one edition. The publications of the other appellant publishing companies are general state farm papers covering the states of Iowa, Wisconsin, Nebraska, Minnesota, and the Dakotas. Appellant Midwest Farm Paper Unit first existed as a voluntary association, but was incorporated in 1931. It was formed and operated as an advertising agency for the appellant publishing companies.

There is no dispute that, acting through the Midwest Company, appellants solicited and obtained advertising by methods whereby, as an illustration, the cost of a one page display advertisement in all of the papers of the five appellant publishers was $4,870 whereas advertising in all but the Indiana edition of the Prairie Farmer would cost $5,167.20. In other words, the Midwest Company, as agent for the other appellants, quoted and obtained a price of $4,870 for advertising in all of the magazines, whereas, if one were omitted, the cost was $5,167.20, or $297.20 more than the amount charged for the greater number. If the Indiana Farmer's Guide was included with the other publications, other than the Indiana Prairie Farmer, the price was $5,951.20. If the Indiana Farmer's Guide was dropped and the Prairie Farmer, Indiana Edition, substituted, the total cost was substantially less than the quoted rates applicable when the advertisement was placed in all of appellants' publications except the Indiana Prairie Farmer.

The specific evidence upon which appellee most relies is that appellants sent to advertisers printed circulars emphasizing the advantages of using Prairie Farmer, Indiana Edition, instead of Indiana Farmer's Guide. This circular set up the comparative cost as above stated and demonstrated that if the Prairie Farmer, Indiana Edition, should be substituted for the Indiana Farmer's Guide, for a one page advertisement covering all the eight states, the advertiser would save $1,081.20. Stated otherwise, the cost to an advertiser to cover one page in all the publications of appellants, including Prairie Farmer, Indiana Edition, was $297.80 less than it would cost him if he omitted Prairie Farmer, Indiana Edition, from the list and advertised in the remaining appellants' publications. In other words, the Mid-West Company quoted a group price upon all of appellants' papers less than the rate upon all of the same except that for the state of Indiana. The lesser group was the more expensive. The cost of advertising in eight states was less than that in seven states. Similar inducements were offered buyers of display advertisements occupying less space.

The parties agree that advertising is the life blood of publications such as these; that every state or comparatively local farm paper comes into competition with national farm papers in advertising merchandise bought by all classes in all parts of the country; and that to that extent, state or sectional papers are competitors with national papers. To the extent that advertisers desired to advertise in the entire territory of the middle west, they were interested in the group rates. It is obvious, therefore, that other things being equal, the lower rates in the combination would attract those advertisers who desired to cover all the territory in which the appellant group circulated and the natural effect would be just so much of a handicap to other papers in the same field who were not in the combination and not able to make a similar one. Thus, papers in any one state, not included in the group, inevitably, all other elements being equal, would see advertisers covering the entire territory drifting away into the group papers. To such extent, the sustaining element of the nongroup paper, advertising, would decrease and if the degree of that alienation should become great enough, it is easy to see that a nongroup paper might eventually have left insufficient advertising to maintain its existence. The evidence is that such was the tendency.

The depression carried with it a decrease in the amount of advertising of all of the papers in question, but that of those of appellants decreased in a much less degree than did that of appellee. The volume of display advertising of the group papers decreased more than 54 per cent. between the years 1928 and 1932 and that of appellee more than 80 per cent. Appellee's additional loss of advertising was nearly 20 per cent. In spite of the fact that its circulation did not grow less, but in fact increased, many advertisers of general character who advertised in 1928 in appellee's paper did not do so in the years following; some who advertised in 1929 did not do so thereafter; some who advertised in 1930-1931 did not do so thereafter. The

number of national advertisers who retired from patronage of appellee was substantial, and appellee's business decreased from a profit of $72,000 in 1928 and $54,000 in 1929 to a deficit in each of the following three years. Its auditor testified that without additional overhead and but for the losses thus experienced, appellee's receipts from display advertising for the years 1928 to 1932 would have been $146,405 more than they were. The depression affected all the papers, but, as stated, the losses of appellee were much more pronounced in volume of advertising, in income therefrom and in net profit, in the face of a rising circulation. Furthermore, whereas in 1928 the Mid-West group carried 54 per cent. of the display advertising of all state farm papers in the territory, in 1932 they carried 84 per cent. In the four years, in states other than Indiana, the Mid-West group absorbed various competing state papers.

The question thus narrowed is whether, under the facts stated, giving full credence to appellee's evidence, it is sufficient, under the rules stated, to sustain the verdict.

Appellee disclaims any contention to rely upon discrimination in prices as ground for recovery. Its own statement of its cause of action is as follows:

"The complaint is predicated on sections 1, 2, and 7 of the Sherman Act [15 U.S.C.A. §§ 1, 2, 15 note], and not on section 2 of the Clayton Act [15 U.S.C.A. § 13]. The complaint does not charge appellants with mere price discriminations for carrying advertisements, but it charges appellants with having entered into a contract, combination and conspiracy in restraint of trade and commerce for the purpose of monopolizing the business of publishing and circulating farm papers within the several states and territory wherein their publications are mainly circulated. Their combination rate schedule for advertisements was simply a device and design conceived and adopted to aid them in the accomplishment of their ulterior purpose to restrain and break down competition and to further their efforts in obtaining a monopoly. For appellants to urge that the case is one for price discrimination within the meaning of section 2 of the Clayton Act is to overlook the complaint as a whole, as well as to assume that each of the several courts to which the clause has been submitted failed to understand the theory of the action.".

It does not contend that a publisher "may not vary the rates scheduled for advertising in proportion to the space used and as the publisher may deem advisable." It does contend that the combination rate schedule was a device to break down competition and build up a monopoly and thus to injure appellee's business. Appellants, on the contrary, contend that their purpose was, in good faith, to improve the methods of soliciting and obtaining advertising and working out more efficient methods of competition to the extent the same existed with the national farm papers and that any resulting effect on appellee's business was only incidental to a legal transaction.

Clearly, the purpose of the Sherman Anti-Trust Act is to secure equality of opportunity and to prohibit abnormal contracts and combinations which tend directly to suppress the conflict for advantage called competition. Paramount Famous Lasky Corp. v. U.S. 282 U.S. 30, 42, 51 S. Ct. 42, 75 L.Ed. 145. Nor is the legality of the combination complained of to be determined by innocence of motives; the prohibition of the statute may not be evaded by good intentions. The legislation is declarative of economic policy, violation of which is deemed detrimental to common welfare, irrespective of motive or other wrongful intent. Standard Sanitary Mfg. Co. v. U. S., 226 U.S. 20, 33 S.Ct. 9, 57 L.Ed. 107; Bedford Cut Stone Co. v. Stone Cutters Ass'n, 274 U.S. 37, 47 S.Ct. 522, 71 L.Ed. 916, 54 A.L.R. 791; Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684; Eastern States Retail Lumber Dealers' Ass'n v. U. S., 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490, L.R.A.1915A, 788. But while good intentions will not save a plan otherwise objectionable, knowledge of actual intent is an aid in the interpretation of facts and prediction of consequences. Appalachian Coals, Inc. v. U. S., 288 U.S. 344, 372, 53 S.Ct. 471, 480, 77 L.Ed. 825. And an act which might be done lawfully by one, may, when done by many acting in concert, take on the form of a conspiracy and become a public wrong, violative of the legislative policy and thus prohibited by law, if the result be hurtful to the public or to individuals against whom such concerted action is directed. Bedford Cut Stone Co. v. Stone Cutters Ass'n, 274 U.S. 37, 47 S.Ct. 522, 71 L.Ed. 916, 54 A.L.R. 791.

The immediate question then is whether the group action of appellants, otherwise

wholly proper, becomes, because of its effect upon appellee, a violation of the law, whether the result of their admitted action in the respects mentioned amounts to an unreasonable restraint of trade or an attempt to monopolize in a combination, the inevitable effect of which is to suppress competition in interstate commerce directly, and not merely indirectly, and which, when put into effect, unduly obstructs trade. If a combination or merger is brought into existence for lawful purpose and as a result decreases overhead and costs of production and thereby reduces prices and only incidentally places a less favored competitor in a position where he is unable to compete in interstate commerce, no offense results because of the competition. As Mr. Chief Justice Hughes, in Appalachian Coals, Inc. v. U. S., supra, says:

"Nothing in theory or experience indicates that the selection of a common selling agency to represent a number of producers should be deemed to be more abnormal than the formation of a huge corporation bringing various independent units into one ownership. Either may be prompted by business exigencies and the statute gives to neither a special privilege. The question in either case is whether there is an unreasonable restraint of trade or an attempt to monopolize. If there is, the combination cannot escape because it has chosen corporate form, and, if there is not, it is not to be condemned because of the absence of corporate integration. As we stated at the outset, the question under the act is not simply whether the parties have restrained competition between themselves but as to the nature and effect of that restraint."

With these principles in mind, was there sufficient evidence to submit to the jury, evidence upon which it might base a finding of intent to bring about a monopoly and unduly to restrain interstate commerce; or does the evidence indicate rather a proper step by appellants in their efforts to bring about economy of cost of procuring advertisements, in their competition with national magazines, the effect of which was only indirectly and incidentally to put appellee in the position of a less favored competitor.

■ In our opinion the latter proposition must prevail. Thus in Paramount Famous Lasky Corporation v. United States, 282 U.S. 30, 51 S.Ct. 42, 44, 75 L.Ed. 145, the court said:

" 'Founded upon broad conceptions of public policy, the prohibitions of the statute (Sherman Act) were enacted to prevent not the mere injury to an individual which would arise from the doing of the prohibited acts, but the harm to the general public which would be occasioned by the evils which it was contemplated would be prevented, and hence not only the prohibitions of the statute, but the remedies which it provided, were coextensive with such conceptions.' D. R. Wilder Mfg. Co. v. Corn Products Co., 236 U.S. 165, 174, 35 S.Ct. 398, 401, 59 L.Ed. 520 [Ann.Cas. 1916A, 118]. 'The purpose of the Sherman Act is to prohibit monopolies, contracts and combinations which probably would unduly interfere with the free exercise of their rights by those engaged, or who wish to engage, in trade and commerce—in a word to preserve the right of freedom to trade.' United States v. Colgate & Co., 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992, 7 A.L.R. 443. * * * 'The Sherman Act was intended to secure equality of opportunity, and to protect the public against evils commonly incident to monopolies, and those abnormal contracts and combinations which tend directly to suppress the conflict for advantage called competition—the play of the contending forces ordinarily engendered by an honest desire for gain.' United States v. American Linseed Oil Co., 262 U.S. 371, 388, 43 S.Ct. 607, 611, 67 L.Ed. 1035."

■ The laws call for vigilance in the detection and frustration of all efforts unduly to restrain the free course of interstate commerce, "but they do not seek to establish a mere delusive liberty either by making impossible the normal and fair expansion of that commerce or the adoption of reasonable measures to protect it from injurious and destructive practices and to promote competition upon a sound basis." Appalachian Coals, Inc., v. United States, 288 U.S. 344, 53 S.Ct. 471, 474, 77 L.Ed. 825. Here, appellants, it seems to us, brought about a situation by agreement amongst themselves whereby in association they could reduce the cost of securing sustenance in the way of advertising in competition to a certain degree with national farm papers. What they sought in that respect was conducive to reduction of cost and to efficiency of operation of their businesses. Unfortunately, appellee was not in position to meet that competition; but that fact, it seems to us, is one of the fortunes of development of industrial prac-

984

tices, and its existence should not stamp with the stigma of illegality the act of appellants. We deem the language of Arkansas Brokerage Co. v. Dunn & Powell, Inc., 173 F. 899, 902, 35 L.R.A.(N.S.) 464 (C.C. A.8), pertinent. There the court said:

"From these cases, and many others to which attention might be called, it seems clear that the Pine Bluff jobbers merely resorted to a common expedient, recognized by law and sanctioned by practice, of forming a subsidiary corporation to promote economy in the management of their existing business and to extend it into other fields of legitimate enterprise. If the new expedient affected interstate commerce at all, it was not in that direct, immediate, or necessary way which alone would make it obnoxious to the law, but only in an indirect, incidental, and unimportant way not within the denunciation of the law. The worst that can be said is that the parties availed themselves of certain advantages and opportunities which their relation to the brokerage business gave them and which materially aided them in the race of competition. If this resulted in injury to the plaintiff, it was damnum absque injuria. Free competition is the life of trade and commerce, and it is quite as important to approve all lawful, fair, and reasonable expedients devised to promote individual success as it is to condemn vicious and unlawful practices which violate individual right and the public weal.

"The learned trial judge should have given the requested instruction to the jury that plaintiff was not entitled to recover. The judgment is therefore reversed, and the cause remanded to the Circuit Court for a new trial in harmony with the views here announced."

We conclude, therefore, that there was not sufficient evidence to sustain a verdict for appellee upon the issue of unlawful restraint.

If we are wrong in our analysis of the evidence and the application of the law thereto, there arises the further question of whether there was sufficient evidence to go to the jury upon the question of legal damage to appellee. The facts, we believe, demonstrate that, so far as damages are concerned, the evidence was sufficient to require submission to the jury and to support the verdict which followed. From the facts produced, the jury might rightfully infer the existence and fix the amount of damages.

The judgment of the District Court is reversed with directions to proceed in accord with the views here expressed.