See also 26 F.R.D. 19.

JOHN WRIGHT & ASSOCIATES, INC.,
a corporation, Plaintiff,

v.

Harold R. ULLRICH, Ora G. Jones, Jr., E. R. Quinn, Mrs. E. S. Hall, S. B. Foot, individually and as members of the T. B. Sheldon Auditorium Board of the City of Red Wing, Minnesota, City of Red Wing, Minnesota, John B. Friedrich, Philip S. Duff, Jr., Red Wing Publishing Co., James Fraser, 20th Century-Fox Film Corporation, United Artists Corporation and Paramount Film Distributing Corporation, Defendants.

Civ. No. 3-59-169.

United States District Court
D. Minnesota,
Third Division.

March 28, 1962.

Dwain M. Ewing, R. H. Fryberger, George Townsend and Patrick Creamer, Minneapolis, Minn., for plaintiff.

Holst, Vogel & Richardson by Charles Richardson, Red Wing, Minn., Grannis & Grannis by Vance B. Grannis, South St. Paul, Minn., for defendants Harold R. Ullrich, Ora G. Jones, Jr., E. R. Quinn, Mrs. E. S. Hall, S. B. Foot, individually and as members of the T. B. Sheldon Auditorium Board of the City of Red Wing, Minnesota, and the City of Red Wing, Minnesota.

Francis H. Watson, Red Wing, Minn., for defendant James Fraser, Holst, Vogel & Richardson by Milton I. Holst, Red Wing, Minn., for defendants Red Wing Publishing Co. and Philip S. Duff, Jr.

DONOVAN, District Judge.

This is a non-jury action commenced by plaintiff under the Sherman Act of Congress [1] wherein plaintiff, a Minnesota corporation, seeks to recover damages and other relief. Prior to trial, the plaintiff moved to dismiss the action as to defendants John B. Friedrich, 20th Century-Fox Film Corporation, United

---

1. Title 15 U.S.C.A. §§ 1, 2 and 15.

"§ 1. Trusts, etc., in restraint of trade illegal; exception of resale price agreements; penalty

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal: * * *.

"§ 2. Monopolizing trade a misdemeanor; penalty

"Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize *any part of the trade or commerce among the several States*, or with foreign nations, shall be deemed guilty of a misdemeanor * * *. (Emphasis supplied.)

"§ 15. Suits by persons injured; amount of recovery

"Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee. * * *"

Artists Corporation, and Paramount Film Distributing Corporation, and agreeable to all parties, plaintiff's motions were granted by the Court. Following trial and oral arguments, a dismissal was ordered by consent of counsel as to defendants Hall and Quinn. The remaining defendants will hereinafter be designated as defendants.

The facts are as follows:

Plaintiff, John Wright & Associates, Inc., is a Minnesota corporation which, during the time here involved, owned and operated a motion picture theater known as the Chief (hereinafter called the Chief) in Red Wing, Minnesota. This theater, duly licensed to operate as such by the City of Red Wing, has a seating capacity of 525 persons and is equipped to show all distributable motion pictures. The Chief is located on one of the main downtown streets in the City of Red Wing.

The City of Red Wing (hereinafter called the City) has a population of approximately 11,000 people and is one of the defendants in this action. The City is the owner of the T. B. Sheldon Memorial Auditorium (hereinafter called the Auditorium) which is centrally located and has facilities for exhibiting motion pictures in addition to extensive facilities for the presentation of stage plays and musicals. The Auditorium also has a community room on a floor apart from the theater which may be used without charge by public groups and civic organizations for various types of meetings. The City holds fee title to the Auditorium subject to the terms and provisions in a deed executed on October 10, 1904, wherein the trustees under the Last Will and Testament of T. B. Sheldon conveyed said property to the City.

Defendants Harold R. Ullrich, Ora G. Jones, Jr., E. R. Quinn, Mrs. E. S. Hall and S. B. Foot as a group constitute the T. B. Sheldon Memorial Auditorium Board (hereinafter called the Board). The members of the Board serve without pay of any kind as a public service to the community. They are appointed by the mayor subject to confirmation by the City Council. Under the terms of the deed of gift by which the City acquired the Auditorium, the Board has general charge of the property and full power and authority to let or lease the Auditorium for musical and theatrical entertainments, public meetings, lectures and such other purposes as, in the judgment of the Board, may contribute to the education, enjoyment, improvement or amusement of the people of said City.

When the Auditorium was first acquired by the City, it was used primarily for stage plays, road shows, musicals, and similar types of entertainment.[2] Motion pictures were first shown at the Auditorium in the year 1911, and, with the advent of the motion picture industry, the legitimate theater experienced a decline which has continued down to the present time. John Wright (president of plaintiff in the case at bar) was employed for a time by the Auditorium as manager and continued in this capacity until he acquired the Chief.

During all the times here pertinent, the Auditorium and the Chief were the only two competitors in the City engaged in the exhibition of motion pictures, although there was, and is, a quasi-competitive and seasonal drive-in motion picture theater on the outskirts of the City. The operating cost of the Auditorium was higher than that of the Chief due to the type of facilities it possessed and maintained.

Defendant, Red Wing Publishing Co. a Minnesota corporation, (hereinafter called the Publisher) is the owner and publisher of the "Daily Republican Eagle" (hereinafter called the Daily) which is the only newspaper published

---

2. Testimony in the case described the delights of forensic display, drama, music and speech when the Auditorium first opened as a playhouse. Defendant Fraser, testifying, described it as viewed today, making it easy to appreciate the type of competitor the Auditorium might well be under lawful, energetic and prudent management.

and circulated in the City. The Daily is under the general management of Philip S. Duff, Jr., who is also a defendant in this action.

On December 25, 1955 the manager of the Auditorium, Edward Swanson, died. Swanson had been manager subsequent to Mr. Wright's employment at the Auditorium. It became necessary for the Board to find someone to replace Swanson. The evidence shows that the applications of some fifteen persons for the position of manager of the Auditorium were considered at meetings of the Board.

Among the fifteen applicants for the position of manager was James Fraser, who is one of the defendants in this action. At the time of making his application, Fraser was working for plaintiff as manager of the Chief.

The Board considered all of the applications and the choice was finally narrowed to said James Fraser and one E. R. Bunn. Bunn, a resident of the City, had never been in the motion picture business. Fraser was hired because of the previous experience he had had with like-theater operations, and, after giving two weeks' notice to plaintiff, he left his position as manager of the Chief and became proprietor of the competing Auditorium.

It is not seriously disputed that Fraser applied for the job for the reason that the Auditorium was large, attractive and better-equipped for a more diverse type of entertainment program than was afforded at the Chief. Fraser, in fact, testified that he was not too happy at the Chief.

At this particular time there was a dearth of desirable film in the motion picture industry and both Fraser and plaintiff encountered difficulties in obtaining desirable film product. In addition to this, plaintiff began having managerial trouble.[3]

Fraser outlined to the Board the problem he was meeting in the absence of desirable film product. Plaintiff claims that the Board granted Fraser a carte blanche to procure all film product which he deemed necessary and desirable to present. Among plaintiff's best attractions were the Disney pictures. Fraser (now proprietor of the Auditorium) requested a division with plaintiff of the Disney product which previously had been distributed by RKO but at the time in question was being distributed by Disney through the Buena Vista Company.

Fraser attempts to justify his demand for said division because of a change in distributing companies, and hence he claimed the Chief was no longer entitled to the Disney product under the so-called split arrangement. This practice, described as "a gentlemen's understanding," had allegedly existed between the Chief and the Auditorium and related to the division of film product between the two theaters. Under this agreement plaintiff claims it had been accustomed to receiving the first-run Disney products without dividing this very popular feature with its competitor.

Plaintiff (as to be expected) opposed dividing its desirable Disney product with the Auditorium and this led to competitive bidding complained of by plaintiff. Bidding for the Disney pictures began in the fall of 1956. (This was the beginning of an era of stress and strain for a number of national producers.) It is admitted that Disney produced only about four or five pictures a year, but what was lacking in quantity was made up for in quality and the Disney films were a popular type of motion picture in the community.

It is clear that Fraser started bidding for Disney pictures because of the lack of comparable pictures for the Auditorium. No claim is made that such bidding was unlawful and both the Chief and the Auditorium had an equal opportunity to bid for the pictures. Plaintiff refrained

---

3. The vicissitudes of fortune met with by Wright following the change from manager to operator came in the wake of his sincere attempts to obtain efficient managers. No doubt it was exasperating to the Chief's management when defendant

from bidding and all of the Disney product was obtained by the Auditorium and shown at that theater to plaintiff's distress and damage in losing one of the prize attractions to the local movie patrons.

In the period that followed, it is undisputed that plaintiff encountered difficulty in competing with the Auditorium, and, with all due propriety and the best of intentions, plaintiff warned the City that as a municipal corporation, it was illegally operating a movie theater in competition with the Chief (a taxpayer and property owner in the City). Plaintiff's warning took the form of a letter and proposed complaint, which was delivered to the City's Mayor Rardin, and which is a matter of record as an exhibit in the present case.

Local resentment to this action taken by plaintiff, even though it was but an exercise of its right as a taxpayer, is suggested by the author of a column published by the Daily.[4] Contributors of letters to the Daily also indicate similar resentment.

In the action that followed in Minnesota State Courts, plaintiff obtained a judgment and decree against the City and the Board, which decree was entered January 20, 1959, enjoining and restraining the City and the Board from operating the Auditorium as a motion picture theater. Judgment was entered pursuant to a mandate from the Supreme Court of the State of Minnesota.[5]

Subsequent to and as a result of this judgment, Fraser applied to the Board to lease its theater and concessions. Out of business as a competing adjunct of the City by virtue of the Minnesota Supreme Court decision, supra, the Board accepted defendant Fraser's offer to lease the Auditorium. Fraser was given possession of the Auditorium and its concessions for a rental of $500.00 per month.

Plaintiff's president testified that after the leasing of the Auditorium to Fraser, it was compelled to discontinue business at the Chief causing the loss herein sued for and treble damages as provided by law.

The basic contentions of plaintiff may be summarized by quoting from its brief, as follows:

"The gist of plaintiff's complaint against the defendants is that they knowingly engaged in concerted and parallel action designed to promote the operation of a motion picture theater, at the municipally-owned Sheldon Memorial Auditorium, as the only 'first run' motion picture theater in the City of Red Wing, Minnesota, and to accomplish this objective eliminated the plaintiff as an effective competitor in the business of exhibiting motion pictures in said city; and that the acts pursued by the defendants to further said designed purpose resulted or tended to result in the creation of a monopoly in Red Wing of the motion picture exhibition business in the Auditorium theater and to restrain the free flow of trade in interstate commerce. * * * "

---

Fraser left the Chief to become manager of its competitor. The Chief's managers were disappointing.

4. To illustrate, (by choosing one of several) plaintiff complains of Publisher's daily "Aimless Amblings" directed at the plaintiff quoted from exhibit 15, as follows:

"Among things that appear odd is that Jim Fraser, who is now manager of the Auditorium theater, was once manager of the Chief under its present owner, Jack Wright. Wright is now threatening suit to make the Auditorium, of which he was once manager, quit the movie business! If successful, of course, it would mean that Fraser wouldn't have a job and Wright would have the only movie theater in Red Wing. Shall we dance?"

In the same exhibit 15 appears an editorial entitled "Here We Go Again" and ending with this:

"It is indeed fortunate that the man who gave this magnificent gift to the city isn't around to see what dire things have happened to it down through the years."

5. John Wright & Associates v. City of Red Wing, 254 Minn. 1, 93 N.W.2d 660; See also: John Wright & Associates,

Defendants deny any individual or concerted action on their part that could be spelled into anything other than participation in public business and civic activity common to any municipality of 11,000 population. Defendants contend that the record does not support alleged violations of the Sherman Act. Defendants further urge that consideration of the evidence directed at the Publisher and the Daily leads to the conclusion that all is in accord with general newspaper practice falling short of actionable misconduct.

Has plaintiff made out a case of violation by defendants of the applicable Acts of Congress? Plaintiff urges as evidence of conspiracy and as alleged violation of the Sherman Act, the following alleged overt acts of defendants:

(a) The interference with the management of the Chief by enticing Fraser from his employment there as manager.

(b) The use of an advantageous competitive position to control desirable film product and to entice patronage from the Chief. This includes the City's and the Board's alleged subsidizing of the Auditorium by means of public taxes paid to the City.

(c) The use of the Daily as a medium for disseminating false and misleading information concerning plaintiff for the purpose of arousing public sentiment against it and inciting a boycott of the Chief. Plaintiff claims that public animosity was promoted by defendants because of the action brought by plaintiff against the Auditorium. Plaintiff further alleges that the headlines, editorials, "Aimless Amblings," letters of the public and unfriendly advertisements inserted by the Publisher all suggest a conspiracy to monopolize.

Pre-trial was had as requested. Plaintiff's counsel submitted a trial brief and the Attorney General's Report of March 31, 1955 (393 pages) all of which has been helpful. The trial of the instant case consumed 27 days all told. The record is voluminous. The exhibits in evidence approximate 325. The minutes of the Court cover 226 pages. The case has been thoroughly tried and briefed, following which counsel indulged in two days of informative oral argument. The recited facts and the minutes of the Court will suffice as a basis for the law that must be applied.

At this point it will be helpful to consider the law applicable to the present action. Jurisdictional prerequisites have been established. Plaintiff and defendants are in accord that, after diligent search, they have been unable to find a case satisfactorily in point. Nor has the Court been successful in finding a controlling decision in the type of the case herein presented.

Consideration of cases tried and decided in the District of Minnesota illustrate distinctions. The instant case is not one where the offending litigant threatened to buy up all production for the express purpose of putting its only competitor "out of business inside of a year."[6] Nor is it a situation where preferred runs were indulged in to the damage of plaintiff following a demand for equal clearance.[7] Many cases have been jointly cited by plaintiff and defendants in support of their respective contentions and which are listed by footnote.[8] In

Inc. v. City of Red Wing, 256 Minn. 101, 97 N.W.2d 432.

6. White Bear Theatre Corporation v. State Theatre Corp., 8 Cir., 129 F.2d 600.

7. Columbia Pictures Corp. v. Charles Rubenstein, Inc., 8 Cir., 289 F.2d 418.

8. American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575; Ballard Oil Terminal Corp. v. Mexican Petroleum Corp., 1 Cir., 28 F.2d 91; Eastern States Retail Lumber Dealers Ass'n v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490; Federal Trade Commission v. Cement Institute, 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010; rehearing denied 334 U.S. 839, 68 S.Ct. 1492, 92 L.Ed. 1764; Interstate Circuit v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610; Klors, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741; United States v. Paramount Pictures, 334 U.S. 131, 68 S.Ct. 915, 92

other words, following consideration of all that has been submitted, it is obvious that the present case must stand or fall on the pleadings, theory of trial and record of its own peculiar facts.

■■ At the outset it should be stated that the law prohibits (see footnote 1) conspiracies or combinations to monopolize or attempt to monopolize any part of interstate of foreign commerce, and the trier of facts must be constantly mindful of the necessity on the part of the offended plaintiff to establish by probative evidence, power in the defendants, which if exercised, would lead to the destruction of plaintiff's right to compete in the common market.[9] However, this power must be distinguished from monopoly power in the popular sense as in the case of the exclusive right to exhibit a film by the only theater in a town. Such monopoly power is not of itself illegal. It must be remembered that it is the existence of the power to exclude competitors from a particular field of interstate commerce, together with the intent to exercise such power, which is condemned by the anti-trust laws.[10]

■ It is, of course, unreasonable per se and unlawful to prevent or destroy competition in order to gain competitive advantage. In other words, one of two theaters in a city such as Red Wing must

not use monopoly power to crush or damage a competitor.[11]

■ If the end sought is monopoly, it is of no consequence that the means were lawful or unlawful. No formal agreement is necessary to establish a conspiracy and business behavior is admissible as circumstantial evidence from which an illegal agreement may be inferred. On the other hand, proof of parallel business behavior does not of itself conclusively establish an unlawful agreement in violation of the anti-trust laws.[12]

The over-all purpose and intent of the anti-trust laws is to prevent those practices, including monopolies and other devices or combinations, which have as their design and effect the restriction or elimination of competition and which thereby work a restraint on trade and commerce among the several states.[13] These laws are intended not only to protect the interests of those actually engaged in commerce by preserving their rights to equal opportunity, but they are also designed to protect the general public from the evils incident to the suppression of competition.[14]

■ However, the anti-trust laws were not intended to condemn any and all acts or practices which might have the effect of restricting competition.

L.Ed. 1260; United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236; United States v. United Shoe Machinery Corp., (D.C.Mass.) 110 F.Supp. 295, affirmed 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910; White Bear Theatre Corporation v. State Theatre Corp., supra, footnote 6.

9. American Tobacco Co. v. United States, 328 U.S. 781, 809, 811, 66 S.Ct. 1125, 90 L.Ed. 1575.
"* * * It is undoubtedly true * * * that trade and commerce are 'monopolized' within the meaning of the federal statute, when, as a result of efforts to that end, such power is obtained that a few persons acting together can control the prices of a commodity moving in interstate commerce. * * *"

10. American Tobacco Co. v. United States, supra footnote 9.

11. United States v. Griffith, supra footnote 8.

12. Theater Enterprises v. Paramount Film D. Corp., 346 U.S. 537, 540, 541, 74 S.Ct. 257, 98 L.Ed. 273.

13. Appalachian Coals v. United States, 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825; United States v. United States Steel Corporation, 251 U.S. 417, 40 S.Ct. 293, 64 L.Ed. 343, 8 A.L.R. 1121; American Column & Lumber Co. v. United States, 257 U.S. 377, 42 S.Ct. 114, 66 L.Ed. 284, 21 A.L.R. 1093; Northern Securities Co. v. United States, 193 U.S. 197, 24 S.Ct. 436, 48 L.Ed. 679.

14. Paramount Famous Lasky Corporation v. United States, 282 U.S. 30, 51 S.Ct. 42, 75 L.Ed. 145; United States v. American Linseed Oil Co., 262 U.S. 371, 43 S.Ct. 607, 67 L.Ed. 1035.

Therefore, acts which only incidentally or indirectly restrict competition, while their principal purpose and effect is the reasonable advancement of legitimate purposes, are not prohibited by the law.[15] Any other interpretation of the anti-trust laws would cast enormous suspicion on the most prosaic of business transactions many of which have at least some bearing on interstate trade, however remote, and possibly work some incidental restraint upon it. Therefore, a reasonable construction of the anti-trust laws is demanded in this regard [16] since these laws are not intended to thwart or otherwise frustrate the intelligent, reasonable and vigorous conduct of business enterprise.[17]

■ The existence of those elements constituting violations of Sections 1 and 2 of the anti-trust laws must be found in the evidence presented to the Court if plaintiff is to obtain the relief sought. As is frequently the situation in suits of this nature, resort must be had to circumstantial evidence in determining whether violations have occurred. Therefore, direct proof is not required and violations of Sections 1 and 2 may be inferred from the things actually done, the conduct of the parties and from the course of dealings or other circumstances.[18] Nonetheless to be effective, the circumstances relied upon by plaintiff to prove a fraudulent conspiracy in restraint of trade must represent substantial evidence of such violation and must rise above the realm of mere suspicion.[19]

Let us assume for the sake of discussion the existence of the "gentlemen's agreement" and reliance thereon by plaintiff (existence of which is denied by defendants) together with publicity in the Daily, added to by the activities of the Auditorium owned by the City and leased to Fraser who was "enticed away" by the Board.

It requires little imagination to appreciate that these activities were offensive to plaintiff. The defendants, together with many other citizens, in their enthusiasm for the Auditorium may have exercised occasional injustice and bad judgment in dealing with plaintiff and its problems. After all, plaintiff's president had been one of the City's exemplary citizens and, as such, certainly was entitled, throughout the crisis he faced at the Chief, to perhaps a greater exercise of tact and understanding on the part of the City and its leaders. It appears from the evidence that some citizens were too willing to prejudge the plaintiff in the role of obstructionist without having fully informed themselves of the vexatious problems which at that particular time beset it.

■ An examination of the evidence reveals the foregoing regrettable circumstances. However, the evidence, when examined in the light of the anti-trust principles previously discussed, does not reveal any substantial basis from which to infer the existence at any time of a fraudulent or illegal agreement or conspiracy among any of the defendants or the existence of any intent on the part of defendants to exercise monopoly power to the detriment of plaintiff.

In fact, the strongest and most compelling inference which can be drawn from the evidence, in the opinion of this Court, is that the decline of plaintiff's business at the Chief was part of an over-all nationwide decline in the motion picture industry which came with the advent of

15. Whitwell v. Continental Tobacco Co., 8 Cir., 125 F. 454, 64 L.R.A. 689.

16. Terminal Warehouse Co. v. Pennsylvania R. Co., 297 U.S. 500, 56 S.Ct. 546, 80 L.Ed. 827; Arkansas Brokerage Co. v. Dunn & Powell, 8 Cir., 173 F. 899, 35 L.R.A.,N.S., 464.

17. Eastern States Retail Lumber Dealers Ass'n v. United States, supra footnote 8; Maple Flooring Mfrs.' Ass'n v. United States, 268 U.S. 563, 45 S.Ct. 578, 69 L. Ed. 1093.

18. Eastern States Retail Lumber Dealers Ass'n v. United States, supra.

19. Johnson v. J. H. Yost Lumber Co., 8 Cir., 117 F.2d 53.

television. Therefore, although plaintiff, in a well prepared and thoroughly presented case, has inferentially cast suspicion upon the acts of defendants, the Court is not convinced that the required burden of substantial evidence is present to such an extent in the instant case to warrant a finding that said anti-trust laws have been violated.

Defendants may submit findings of fact, conclusions of law, order for and form of judgment consistent with the foregoing.

It is so ordered.

Plaintiff may have an exception.